UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| METHODIST HEALTH SERVICES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 13-cv-1054 |
| v. | ) ) ) | Judge: Sara Darrow Magistrate Judge: John A. Gorman |
| OSF HEALTHCARE SYSTEM, an Illinois not-for-profit corporation d/b/a SAINT FRANCIS MEDICAL CENTER, | ) ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT OSF HEALTHCARE SYSTEM'S ANSWER AND AFFIRMATIVE DEFENSES

Defendant OSF Healthcare System ("OSF"), owned and operated by The Sisters of the Third Order of St. Francis, Peoria, Illinois, is a not for profit health care provider and hospital system. In the spirit of Christ and the example of Francis of Assisi, the Mission of OSF HealthCare is to serve persons with the greatest care and love in a community that celebrates the gift of life. It carries out this Mission by providing high-quality medical care to improve the lives of those it serves.

OSF believes that the present lawsuit filed by Methodist Health Services Corporation ("Methodist") is without merit. OSF has not achieved its current status as a leading provider of high-quality, low-cost medical care in the community by, as Methodist claims, coercing and threatening third-party payors like health insurance companies. Rather, OSF has succeeded through an unstinting commitment to excellence, collaboration, and innovation. Contrary to the allegations in the Complaint, OSF is nationally recognized as developing proactive solutions to deliver the best medical care in a cost-efficient manner, including through enhanced clinical

integration – a fact reflected in OSF's designation as a Pioneer Accountable Care Organization by the United States Department of Health and Human Services.

Moreover, OSF-affiliated physicians are free to treat patients at OSF or non-OSF facilities and payors are free to negotiate their own reimbursement rates. In short, OSF does not make decisions for the purpose of harming Methodist or any other health care provider in Illinois. OSF is confident that it will prevail against Methodist's claims and regrets that this lawsuit will divert valuable community resources from addressing the true challenges of the rapidly evolving health care industry. OSF accordingly answers the Complaint, by and through its counsel, as follows:[1]

## INTRODUCTION

1. Peoria's dominant hospital system, Saint Francis, has engaged in predatory and exclusionary conduct to reduce competition and raise prices at the expense of consumers in the relevant markets.

> **ANSWER:** **The averments set forth in Paragraph 1 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 1 are facts, they are denied.**

2. Saint Francis has substantial market power in two product markets in the relevant geographic market: (a) the sale of general acute-care inpatient hospital services ("inpatient hospital services") to commercial health insurers; and (b) the sale of outpatient surgical services to commercial health insurers. Saint Francis has an approximate 53% share of the market for inpatient hospital services sold to commercial health insurers and a greater than 50% share of the market for outpatient surgical services sold to commercial health insurers. Commercial health insurers in the relevant geographic market consider Saint Francis a "must-have" hospital for

---

[1] For the convenience of the Court and the parties, the allegations of the Complaint, including section headings, are repeated in this Answer.

80577934v1  0943458

health plans because it is by far the largest hospital in the region and the only local provider of certain essential services, including tertiary pediatric services.

> **ANSWER:** **The averments set forth in Paragraph 2 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 2 are facts, they are denied.**

3.      Saint Francis has maintained its substantial market power in the relevant markets by forcing commercial health insurers to enter into provider agreements that effectively exclude Saint Francis' most significant competitors in the relevant geographic market from contracting with those insurers ("exclusionary contracts"). Saint Francis has leveraged its size and status as a "must-have" hospital to enter, maintain and enforce these exclusionary contracts that effectively preclude commercial health insurers from contracting with hospitals and other healthcare facilities without the permission of Saint Francis.

> **ANSWER:** **Denied. OSF's contracts are documents that speak for themselves and any characterization thereof is denied.**

4.      Specifically, Saint Francis has threatened (a) to withdraw from a commercial health insurer's network and take along with it the essential services that only Saint Francis can provide, as well as the other hospitals in the OSF Healthcare System, if an insurer contracts with a competing provider, and/or (b) to impose a substantial pricing penalty if insurers include a competing provider within their network. The effects of this conduct are to make the cost of including a competing hospital or other healthcare facility in an insurer's network prohibitively expensive and not commercially viable, and to exclude equally or more efficient competitors.

> **ANSWER:** **Denied.**

5.      Saint Francis' exclusionary conduct has reduced competition and enabled Saint Francis to maintain its substantial market power in the provision of inpatient hospital services and outpatient surgical services. Saint Francis' exclusionary conduct has done so by (1) delaying

80577934v1  0943458

and preventing the expansion and entry of Saint Francis' competitors; and (2) reducing quality competition between Saint Francis and its competitors. This has led to higher healthcare costs, higher health insurance premiums, and reduced consumer choice in the relevant markets.

**ANSWER: Denied.**

6.    There is no valid pro-competitive business justification for Saint Francis' exclusionary conduct. Instead, Saint Francis has engaged in its exclusionary conduct in direct response to the competitive threat presented by Methodist and others to its dominant position in the relevant market.

**ANSWER:    The averments set forth in Paragraph 6 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 6 are facts, they are denied.**

7.    The former Chief Executive Officer of OSF Healthcare System has told representatives from Methodist that Peoria should be a two-hospital town consisting of Saint Francis and Proctor Hospital. Saint Francis has been so focused on destroying the competition posed by Methodist that it has forced insurers either to terminate pre-existing relationships with Methodist or exclude Methodist from any opportunity to participate in their networks. Such anti-competitive conduct effectively denies Methodist access to critical commercial insurance contracts and substantially reduces the number of patients who would otherwise use Methodist. In addition, Saint Francis' conduct has the additional goal and effect of dissuading physicians from referring patients to Methodist and from performing cases at Methodist, and ultimately decreasing Methodist's revenues. Due to Saint Francis' exclusionary conduct, Methodist has suffered damages.

**ANSWER:    OSF admits only that its former Chief Executive Officer had told representatives of Methodist that a merger between OSF and Methodist would be in the best interests of the community and further both organizations' missions by allowing for more efficient delivery of**

4

**care and reducing costs. To the extent that the remaining averments set forth in Paragraph 7 are facts, they are denied.**

8.      All of Saint Francis' actions have been taken with the purpose and intent of monopolizing the market by driving Methodist from the market and/or reducing Methodist's competitive significance. Saint Francis has resorted to anti-competitive tactics because Methodist's operation has had a pro-competitive and price-lowering influence on the delivery of healthcare services in the relevant market. Methodist is a recognized provider in the relevant market in terms of quality, service and prices. Its prices are lower than those of Saint Francis' facilities. Methodist's presence in the relevant market should cause Saint Francis to competitively respond by lowering its own rates to payers. Instead, Saint Francis has remained the most expensive provider in the relevant market because of its exclusionary conduct.

> **ANSWER:     Denied. By way of further response, OSF is a leading innovator in developing high quality, low cost solutions to the delivery of health care, as shown, for example, in its selection as a Pioneer Accountable Care Organization by the United States Department of Health and Human Services. OSF does not make decisions for the purpose of harming Methodist or any other health care provider in Illinois.**

## THE PARTIES

9.      Saint Francis is a not-for-profit hospital located in Peoria, Illinois that is licensed to provide hospital services in the state of Illinois.

> **ANSWER:     Admitted.**

10.     Methodist is an integrated health care delivery system consisting of various operating divisions, including an acute care hospital located in Peoria, Illinois. Methodist's hospital is licensed to provide hospital services in the state of Illinois.

> **ANSWER:     Admitted.   Methodist is the eighth senior affiliate of Iowa Health System ("IHS"), the fifth largest nondenominational health system in the United States with annual revenues of approximately $2.3 billion. IHS has relationships with 25 hospitals in Illinois and Iowa, more than 160 physician clinics, and employs more than 20,000 employees and**

5

sees more than 2.5 million patient visits per year, according to IHS's own public statements.

## JURISDICTION AND VENUE

11.     Methodist brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and the costs of suit, including reasonable attorneys' fees; to enjoin Saint Francis' anti-competitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Saint Francis' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and other state related claims.

> **ANSWER:**     **The averments set forth in Paragraph 11 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 11 are facts, they are denied.**

12.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the causes of action asserted in this complaint arise under the laws of the United States.  This Court has supplemental jurisdiction over the causes of action asserted under state law pursuant to 28 U.S.C. § 1367 because the state law causes of action are so related to the causes of action within the Court's federal question jurisdiction that the state law causes of action form part of the same case or controversy.

> **ANSWER:**     **The averments set forth in Paragraph 12 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 12 are facts, they are denied.**

13.     This Court is the appropriate venue for this action because, pursuant to 28 U.S.C. § 1391(b)(1) and (2), defendant Saint Francis resides in this judicial district and a substantial part of the events that give rise to the claims asserted in this complaint occurred in this judicial district.

> **ANSWER:**     **The averments set forth in Paragraph 13 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 13 are facts, they are denied.**

80577934v1 0943458

# I.   RELEVANT MARKET

## A.   Relevant Product Markets

### 1.   The sale of inpatient hospital services to commercial health insurers

14.   The sale of inpatient hospital services to commercial health insurers is a relevant product market.

> **ANSWER:**   The averments set forth in Paragraph 14 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 14 are facts, they are denied.

15.   Inpatient hospital services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient.  Inpatient services do not include: (a) services at hospitals that serve solely children, military personnel or veterans; (b) services at outpatient facilities, including hospital-based outpatient departments, that provide same-day service only; and (c) services at facilities that provide only psychiatric, substance abuse, and rehabilitation services.  Although individual inpatient hospital services are not substitutes for each other (e.g., oncology and cardiac services are not substitutes for each other), it is generally appropriate for the various individual inpatient hospital services to be aggregated into a "cluster market" for economic purposes.

> **ANSWER:**   OSF admits only that Methodist purports to define the term "inpatient hospital services" as set forth in Paragraph 15.  To the extent that the remaining averments set forth in Paragraph 15 are facts, they are denied.

16.   The market for the sale of inpatient hospital services to commercial health insurers excludes outpatient surgical services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase. There are no reasonably interchangeable services for inpatient hospital services.

> **ANSWER:**   OSF admits only that Methodist purports to define the term "commercial health insurers" as set forth in Paragraph 16 and that

80577934v1 0943458

> **two manners of self-funded plans' access to providers are through managed care organizations and rental networks.  To the extent that the remaining averments set forth in Paragraph 16 are facts, they are denied.**

17.     Commercial health insurers include managed-care organizations, such as Blue Cross Blue Shield of Illinois ("BCBS"), Humana, Health Alliance, Aetna, United Healthcare, Coventry Health Care, other HMOs or PPOs, and employer self-funded plans.  Self-funded plans may access provider networks through managed-care organizations or rental networks.  Although not all of these are risk-bearing entities, they can be referred to collectively as "commercial health insurers."  Commercial health insurers do not include public third-party payers such as Medicare, Medicaid, and TRICARE.

> **ANSWER:**     **The averments set forth in Paragraph 17 are conclusions of law to which no response is required.  By way of further response, health care providers, including both OSF and Methodist, contract directly with certain employer self-funded health plans.  The averments of facts set forth in Paragraph 17 are denied.**

18.     The market for the sale of inpatient hospital services to commercial health insurers does not include the sale of such services to government payers.  The primary government payers are the federal government's Medicare program (coverage for the elderly and disabled), the joint federal and state Medicaid programs (coverage for low-income persons), and the federal government's TRICARE program (coverage for military personnel and families).

> **ANSWER:**     **The averments set forth in Paragraph 18 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 18 are facts, they are denied.**

19.     The exclusion of government payers from the relevant market is warranted because government reimbursement rates will not significantly constrain the pricing of healthcare providers to commercial health insurers for the following reasons:

> a.     Generally, the rates that commercial health insurers pay healthcare providers are substantially higher than those paid by government payers

80577934v1 0943458

because a healthcare provider's negotiation with a commercial health insurer is separate from the process used to determine the rates paid by government payers; and

    b.    The federal government unilaterally sets the rates and schedules at which it will pay healthcare providers for services provided to individuals covered by Medicare and TRICARE; Medicaid rates are controlled by states and so the same considerations apply. In contrast, commercial health insurers negotiate their rates with individual healthcare providers and sell health insurance policies to organizations and individuals, who pay premiums for those policies.

**<u>ANSWER:</u>** **The averments set forth in Paragraph 19 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 19 are facts, they are denied.**

20.    There are no reasonable substitutes or alternatives to inpatient hospital services sold to commercial health insurers. Because rate negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payers, a healthcare provider can target a price increase solely at commercial health insurers, who cannot avoid such a price increase by shifting to lower government rates. Moreover, patients who are ineligible for Medicare, Medicaid, and/or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of inpatient hospital services sold to commercial health insurers could profitably maintain supracompetitive prices for those services over a sustained period of time.

**<u>ANSWER:</u>** **The averments set forth in Paragraph 20 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 20 are facts, they are denied.**

    **2.    The sale of outpatient surgical services to commercial health insurers**

21.    The sale of outpatient surgical services to commercial health insurers is a relevant product market.

**ANSWER:**   The averments set forth in Paragraph 21 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 21 are facts, they are denied.

22.     Outpatient surgical services are a broad group of surgical and related services that generally do not require an overnight stay in a hospital.  Outpatient surgical services are typically performed in a hospital or other specialized facility, such as a free-standing ambulatory surgery center that is licensed to perform outpatient surgery.  Outpatient surgical services are distinct from procedures routinely performed in a doctor's office.  Outpatient surgical services do not include services at hospitals or other facilities that serve solely children, military personnel, or veterans.  Although individual outpatient surgical services are not substitutes for each other (e.g., orthopedic and urological surgical services are not substitutes for one another), the various individual outpatient surgical services can be aggregated into a "cluster market" for economic purposes.

**ANSWER:**   OSF admits only that Methodist purports to define the term "outpatient surgical services" as set forth in Paragraph 22.  To the extent that the remaining averments set forth in Paragraph 22 are facts, they are denied.

23.     The market for the sale of outpatient surgical services to commercial health insurers excludes inpatient hospital services because health plans and patients would not substitute inpatient care for outpatient surgical services in response to a sustained price increase.

**ANSWER:**   The averments set forth in Paragraph 23 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 23 are facts, they are denied.

24.     There are no reasonable substitutes or alternatives to outpatient surgical services sold to commercial health insurers.  A healthcare provider's rate negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payers, and a healthcare provider could, therefore, target a price increase solely at commercial

80577934v1 0943458

health insurers, who cannot avoid such a price increase by shifting to lower government rates. Moreover, patients who are ineligible for Medicare, Medicaid, and/or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of outpatient surgical services sold to commercial health insurers could profitably maintain supracompetitive prices for those services over a sustained period of time.

> **ANSWER:** The averments set forth in Paragraph 24 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 24 are facts, they are denied.

**B.    Relevant Geographic Market**

25.    The relevant geographic market in this matter is no larger than the Illinois counties of Peoria, Tazewell, and Woodford (the "Tri-County Area").

> **ANSWER:** The averments set forth in Paragraph 25 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 25 are facts, they are denied.

26.    To market their products to employers and individuals, commercial health insurers contract to purchase inpatient hospital services and outpatient surgical services in the geographic area in which their health plan beneficiaries are likely to seek medical care. Health plan beneficiaries typically seek medical care close to their homes or workplaces.

> **ANSWER:** OSF admits only the averments set forth in the first sentence. As to the second sentence, OSF does not know what Plaintiff means by the terms "typically" and close," and the averments in that sentence are accordingly denied.

27.    Few plan beneficiaries who live within the Tri-County Area travel outside its borders to seek inpatient hospital services or outpatient surgical services. Commercial health insurers that sell policies to beneficiaries in the Tri-County Area cannot reasonably purchase inpatient hospital services or outpatient surgical services outside the Tri-County Area as an

80577934v1 0943458

alternative to serve those beneficiaries. As a result, hospitals and other healthcare facilities located outside of the Tri-County Area do not compete with healthcare providers within the Tri-County Area for the sale of inpatient hospital services and outpatient surgical services in a manner that would significantly constrain the pricing or other behavior of healthcare providers in the Tri-County Area.

> **ANSWER:** **The averments set forth in Paragraph 27 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 27 are facts, they are denied.**

28. Competition for the sale of inpatient hospital services to commercial health insurers from providers located outside the Tri-County Area is not sufficient to prevent a hypothetical monopolist provider of inpatient hospital services to commercial health insurers located in the Tri-County Area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

> **ANSWER:** **The averments set forth in Paragraph 28 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 28 are facts, they are denied.**

29. Competition for the sale of outpatient surgical services to commercial health insurers from providers located outside the Tri-County Area is not sufficient to prevent a hypothetical monopolist provider of outpatient surgical services to commercial health insurers located in the Tri-County Area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

> **ANSWER:** **The averments set forth in Paragraph 29 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 29 are facts, they are denied.**

**C.** **Entry Barriers**

30. There are substantial entry barriers into these relevant markets.

> **ANSWER:** The averments set forth in Paragraph 30 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 30 are facts, they are denied.

31. The capital costs to construct a new hospital are substantial. A hospital that would compete with Saint Francis in terms of service offerings would require an initial outlay of $250 million or higher. This would entail a significant risk to investors.

> **ANSWER:** Admitted that the capital costs to construct a new hospital that would compete with St. Francis or Methodist across all their respective service offerings would require a substantial outlay. As to the exact amount of such an outlay or the risks to investors, OSF lacks sufficient knowledge or information to respond to the averments set forth in Paragraph 31 (which appear to be more speculation than allegations of fact) and they are accordingly denied.

32. A new hospital must recruit and hire qualified staff and physicians. Hospitals also rely on referrals from physicians. A new hospital in the Tri-County Area would need to convince area physicians to change their referral patterns. This would be difficult enough if all physicians in the area had independent practices. Here, it would be even more difficult because Saint Francis has sewn up the loyalties of many physicians through its OSF Medical Group, which owns the practices of referring physicians, and other physician groups controlled by Saint Francis or its affiliates.

> **ANSWER:** OSF admits only that a hospital cannot function without an adequate medical staff of physicians who admit patients and supervise their care. The remaining averments set forth in Paragraph 32 are denied. By way of further response, OSF has not restricted its employed physicians from practicing at or admitting patients to other facilities, including Methodist.

33. Barriers to entry also include the expense and difficulty of building a reputation in the community, and gaining accreditation from relevant accrediting organizations.

> **ANSWER:** OSF admits only that a hospital needs appropriate licensure and accreditation, and that reputation in the community can sometimes influence patient care decisions. To the extent that the remaining averments set forth in Paragraph 33 are facts, they are denied.

13

34.     In addition to the inherent complexity and significant financial and time investment involved, anyone seeking to open a new hospital in Illinois or expand an existing one faces another barrier—Certificate of Need.  The Illinois' Health Facilities Planning Board must approve any application to build a new hospital or an application to expand a hospital.  The Planning Board does this by applying specified criterion.

> **ANSWER:**     **The averments set forth in Paragraph 34 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 34 are facts, they are denied.**

35.     For outpatient facilities, the same entry barriers mentioned in Paragraph Nos. 30-34 above exist, but to a lesser extent.

> **ANSWER:**     **OSF hereby incorporates its responses to Paragraphs 30-34, as if fully set forth herein. To the extent that there are additional averments of fact set forth in Paragraph 35, they are denied.**

## II.     TRI-COUNTY AREA MARKET PARTICIPANTS

### A.     Hospital Providers

36.     The Tri-County Area includes six hospitals.  There are three general, acute care hospitals in Peoria County: Saint Francis, Methodist, and Proctor Hospital.  There are two, much smaller, hospitals in Tazewell County: Pekin Memorial Hospital, and Hopedale Medical Complex.  The sixth hospital, Advocate Eureka Hospital, is located in Woodford County.

> **ANSWER:**     **Admitted, assuming that Plaintiff intends to exclude Greater Peoria Specialty Hospital (Kindred), a long-term acute facility, from its definition of "hospital."**

### 1.     OSF Saint Francis Medical Center

37.     The OSF Healthcare System consists of seven acute care facilities, one long-term care facility and two colleges of nursing located in Peoria and Rockford, Illinois.  In the 2011 fiscal year, the OSF Healthcare System had over $1.8 billion in annual net revenue and total assets worth over $2.4 billion.

14

**ANSWER:** **Admitted, except that OSF owns eight acute care facilities and it no longer owns a long term care facility.**

38.     Saint Francis is the flagship hospital of the OSF Healthcare System. Saint Francis also is the fourth largest medical center in the state of Illinois. With approximately 616 licensed beds and a medical staff of about 800 physicians, Saint Francis is by far the largest hospital not only in Peoria, but also the surrounding counties. It is nearly double the size of Methodist and more than three times the size of Proctor Hospital.

**ANSWER:** **Admitted, except for the allegation that St. Francis Medical Center "is the fourth largest medical center in the state of Illinois." By way of further response, based on licensed beds, St. Francis is the seventh largest hospital in the State of Illinois.**

39.     Commercial health insurers that offer health insurance within the Tri-County Area consider Saint Francis a "must have" hospital because of its size and the fact that it is the only provider of some essential services in Peoria and the surrounding counties. Such exclusive services include, but are not limited to, solid organ transplants, tertiary pediatric services, Level 3 neonatal intensive care ("NICU"), and Level 1 Trauma care.

**ANSWER:** **OSF admits only that it is the sole provider of certain services in the Tri-County Area (as defined in the Complaint), including certain pediatric tertiary and transplant services, neonatology services, and Level I Trauma care. The remaining averments set forth in Paragraph 39 are denied. By way of further response, Methodist is likewise the sole provider of certain services in the Tri-County Area and has the ability to develop other services, including most, if not all, of the services referenced in Paragraph 39.**

### 2.     The Methodist Medical Center of Illinois

40.     Methodist was founded in 1900 through the efforts of deaconesses of the Methodist Episcopal Church. It has 329 licensed beds, 17 operating rooms, a Level 2 Trauma Center, and almost 600 board-certified physicians on staff. Methodist, however, currently does

15

not provide several services that Saint Francis provides, including, but not limited to, Level 1

Trauma care, NICU, tertiary pediatric services, and organ transplants.

> **ANSWER:** **Admitted. By way of further response, Methodist is the sole provider of certain services in the Tri-County Area and has the ability to develop other services, including most, if not all, of the services referenced in Paragraph 40.**

41.     Methodist is a recognized leader in healthcare in Central Illinois.  Methodist is the

first hospital in downstate Illinois to be awarded Magnet designation for Excellence in Nursing

Services, the nation's highest honor in patient care.  Methodist Medical Group, the network of

primary care and specialty physicians, has offices located throughout central Illinois, including

Methodist MedPointe walk-in urgent care centers.

> **ANSWER:** **Admitted, except as to the allegation that Methodist "is the first hospital in downstate Illinois to be awarded Magnet designation for Excellence in Nursing Services."  OSF lacks sufficient knowledge or information to respond to that averment, and it is accordingly denied.**

42.     Methodist also is home to Methodist College, dedicated to providing nursing and

health sciences education and the Family Medicine and Psychiatry Residency Programs of the

University of Illinois College of Medicine-Peoria.

> **ANSWER:** **Admitted.**

43.     Methodist is Saint Francis' most significant competitor in Peoria and the

surrounding counties, and Saint Francis considers it to be so.

> **ANSWER:** **OSF admits only that, within Peoria, Illinois, Methodist is the next largest hospital.  The remaining allegations set forth in Paragraph 43 are denied.  By way of further response, OSF is an integrated health system with numerous facilities throughout central and northern Illinois and does not make operations or strategic decisions in order to harm other providers.  OSF considers itself an integrated health systems, similar in competitive significance to IHS and other integrated health systems.**

> **3.     Proctor Hospital**

80577934v1 0943458

44.     Proctor Hospital is the smallest general acute care hospital in the city of Peoria.  It has 223 licensed beds and provides inpatient and outpatient surgical services.  Proctor Hospital does not offer Level 1 or Level 2 Trauma care.

**ANSWER:     Admitted.**

4.     **Pekin Memorial Hospital**

45.     Pekin Hospital is located in Tazewell County in the city of Pekin, which is approximately 12 miles from downtown Peoria.  It serves a relatively small area, with the vast majority of its patients residing in Pekin and the surrounding communities within Tazewell County.  Pekin Hospital has 125 licensed beds.  It provides inpatient and outpatient services, but does not offer Level 1 or Level 2 Trauma care.

**ANSWER:     Admitted, except for any averments regarding Pekin Hospital's service area and the geographic origins of its patients.  OSF lacks knowledge or information sufficient to respond to those allegations and they are accordingly denied.**

5.     **Advocate Eureka Hospital**

46.     Eureka Hospital is owned by Advocate Health and Hospital Corporation.  It is located in Woodford County in the city of Eureka, which is approximately 18 miles from downtown Peoria.  Eureka Hospital is a critical access hospital with a licensed capacity of 25 beds.  The hospital provides inpatient and outpatient services, but does not offer Level 1 or Level 2 Trauma care.  In 2010, its average daily census was 5.9 patients.

**ANSWER:     Admitted, except as to the last sentence.  OSF lacks knowledge or information sufficient to respond to the allegations in the last sentence of Paragraph 46 and they are accordingly denied.**

6.     **Hopedale Hospital**

47.     Hopedale Hospital is located in Tazewell County in the city of Hopedale, which is approximately 25 miles from downtown Peoria.  It is a critical access hospital with a licensed

80577934v1 0943458

capacity of 25 beds. Hopedale Hospital provides inpatient and outpatient services, but does not offer Level 1 or Level 2 Trauma care. In 2010, its average daily census was nine patients.

> **ANSWER:** Admitted except as to the last sentence. OSF lacks knowledge or information sufficient to respond to the allegations in the last sentence of Paragraph 47 and they are accordingly denied.

### B.      Other Outpatient Surgical Facilities

48.      All six hospitals offer outpatient surgical services on their campus. In addition, there are non-hospital based providers that offer, among other things, general surgery, urological surgery, orthopedic surgery, and plastic and dermatological surgery in freestanding ambulatory centers. Some of these providers include: Peoria Day Surgery Center; Musculoskeletal surgery center; Peoria Ambulatory Surgery Center; and the OSF Center for Health. The Center for Health was opened in 2001 by Saint Francis. Saint Francis maintains a majority interest and control over the facility.

> **ANSWER:** Admitted, except that the "OSF Center for Health" is the incorrect name of this entity and this entity is controlled by its Board of Managers, not OSF. The correct name for this entity is the Center for Health Ambulatory Surgery Center LLC.

### C.      Commercial Health Insurers

49.      The commercial purchasers of inpatient hospital services and outpatient surgical services include managed-care organizations, such as BCBS, Humana, Health Alliance, Aetna, United Healthcare, Coventry Heath Care, other HMOs or PPOs, and employer self-funded plans.

> **ANSWER:** Admitted.

50.      Six commercial health insurers represent approximately 86% of the fully insured commercial insurance market in the Tri-County Area. BCBS is by far the largest carrier. Health Alliance, Humana and United Healthcare are relatively equal in size to each other followed by Coventry Health Care and Aetna.

80577934v1 0943458

> **ANSWER:** OSF lacks sufficient knowledge or information to respond to the averments set forth in Paragraph 50, which are accordingly denied.

## III. SAINT FRANCIS' MARKET POWER

51.     Saint Francis has substantial market power in the two relevant product markets in the city of Peoria, as well as the Tri-County Area: (a) the sale of inpatient hospital services to commercial health insurers; and (b) the sale of outpatient surgical services to commercial health insurers.

> **ANSWER:** The averments set forth in Paragraph 51 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 51 are facts, they are denied.

52.     In 2012, of the facilities in the Tri-County Area, Saint Francis held approximately 53% of the inpatient commercial hospital service market based on patient admissions and approximately 52% when measured by total number of days.

> **ANSWER:** OSF lacks sufficient knowledge and information as to the source(s) and methodology used by Plaintiff to generate the averments set forth in Paragraph 52, and they are accordingly denied.

53.     Another indication of Saint Francis' market power in Peoria and the Tri-County Area is its ability to secure higher prices for its services, even as it imposes onerous and unwanted contractual restrictions on most commercial insurers with which it contracts. For example, in 2011, Saint Francis' average charge per admission was approximately 37% higher than Methodist, its primary competitor in the Tri-County Area.

> **ANSWER:** Denied.

54.     Although its prices are, on average, significantly higher than those of the hospitals with which it competes, most commercial health insurers conclude that they must, nonetheless, contract with Saint Francis to make their provider network attractive to policy holders because commercial health insurers consider Saint Francis to be a "must-have" hospital in the area.

80577934v1 0943458

**ANSWER:   Denied.**

55.     Saint Francis is the only area provider of some essential services, such as tertiary pediatric services, solid organ transplants and NICU for the treatment of low birth weight babies. It is the area's only hospital with a Level 1 Trauma Center, which is the highest designated level of trauma care.  Saint Francis is a member of the Council of Teaching Hospitals of the American Association of Medical Colleges, a distinction shared by approximately 400 of the nation's hospitals and health systems.  According to its website, Saint Francis also is a "major teaching affiliate of the University of Illinois, College of Medicine in Peoria."

> **ANSWER:      OSF admits only that it is the sole provider of certain services in the Tri-County Area (as defined in the Complaint), including certain pediatric tertiary and transplant services, neonatology services, and Level I Trauma care.  However, OSF denies that the alleged "Tri-County Area" is a properly defined antitrust market for all health care services or for the competition for rates negotiated with third-party payors.  By way of further response, Methodist is likewise the sole provider of certain services in the Tri-County Area and has the ability to develop other services, including most, if not all, of the services provided by St. Francis.  OSF admits that St. Francis is a member of the Council of Teaching Hospitals.   OSF's website is a document that speaks for itself and any characterization thereof is denied.   To the extent that the remaining averments set forth in Paragraph 55 are facts, they are denied.**

56.     Saint Francis also possesses market power in the outpatient surgical services market given the size of its hospital and its ownership interest and control over the Center for Health.  For example, among the facilities located in Peoria performing outpatient ambulatory surgeries, Saint Francis' share of the Peoria market exceeds 50%.

**ANSWER:   Denied.**

57.     Saint Francis' prices are, on average, significantly higher for outpatient surgical services than those of other area hospitals and providers.

**ANSWER:   Denied.**

80577934v1 0943458

## IV.    SAINT FRANCIS' ANTICOMPETITIVE CONDUCT

### A.    Saint Francis Has Willfully Maintained Its Substantial Market Power Through The Use Of Anticompetitive Exclusionary Conduct

58.    Sometimes a geographic market will contain a "must-have" hospital, which is one that health care plans believe they must offer to their beneficiaries to attract employers to the plan.  In such situations, a "must-have" hospital possesses substantial bargaining power and can leverage its position to increase profits beyond those it would otherwise earn in a competitive market by: (a) demanding a higher, monopoly reimbursement rate on the services over which it has market power while continuing to accept reimbursement rates for its other services at a competitive level; or (b) applying a smaller increase in price to the full set of patients it treats, whether the patients receive competitively or non-competitively provided services (i.e., a smaller increase applied to a broader set of services).

> **ANSWER:**    **OSF admits only that Methodist purports to define the term ""must have' hospital" as set forth in Paragraph 58.  Any averments of fact set forth in Paragraph 58 are denied.**

59.    The latter situation is facilitated by the threat to withdraw from the network or charge a significantly higher reimbursement rate for the services over which it has market power if a commercial insurer does not agree also to pay higher rates on those services over which the "must-have" hospital has less market power.  For example, the latter situation will arise as a byproduct of an exclusionary contract that forces a commercial health insurer who would otherwise prefer to deal with multiple hospitals to instead deal only with the "must-have" hospital (in this case, not only is the higher price applied to a wider set of services, it also is applied to a greater total number of patients).  This is exactly the conduct that Saint Francis has engaged in to reduce competition in the area.

> **ANSWER:**    **Denied.**

80577934v1  0943458

60.     The former Chief Executive Officer of OSF Healthcare System has told representatives from Methodist that Peoria should be a two-hospital town consisting of Saint Francis and Proctor Hospital. Saint Francis, however, has not sought to accomplish this publicly stated goal through lower prices, better quality and/or more efficient services. Instead, Saint Francis has leveraged its "must-have" status, size, and substantial market power to force commercial health insurers to enter into exclusionary contracts. Saint Francis has used these exclusionary contracts to effectively prevent commercial health insurers from contracting with its most significant competitors. Specifically, Saint Francis has threatened to withdraw from an insurer's network and take along with it the essential services that only Saint Francis can provide, as well as the other hospitals in the OSF Healthcare System, if an insurer contracts with a competing provider, such as Methodist.

> **ANSWER:** **OSF admits only that its former Chief Executive Officer had told representatives of Methodist that a merger between OSF and Methodist would be in the best interests of the community and further both organizations' missions by allowing for more efficient delivery of care and reducing costs. To the extent that the remaining averments set forth in Paragraph 60 are facts, they are denied.**

61.     Saint Francis also enforces its exclusionary contracts by threatening insurers with a substantial pricing penalty (i.e., full reimbursement rates on essential services that it is the only provider of, such as neonatal care) if they include a competing provider in their network. Such pricing penalties would make it prohibitively expensive for an insurer to include a competing hospital in its network.

> **ANSWER:** **Denied. OSF denies threatening insurers with "pricing penalties." Rather, certain pricing terms between OSF and certain insurers could be affected by the volume of a payor's members using its system. Configuration of a payor's network affects volume and changes in network configuration could lead to price renegotiation.**

22

62.     For example, Saint Francis operates the only children's hospital in the Tri-County Area.  On several occasions, Methodist has been informed by its payor advisor group, which consists of a group of representatives from 12 area payors that periodically meets with Methodist to discuss how Methodist can maintain and improve its relationships with payors, that Saint Francis will not offer discounts on its pediatric services or allow such services to be included unless the payors exclude Methodist, as well as use all of Saint Francis' services.  In the past, Saint Francis has highlighted the significance of its power by running billboards and direct to consumer postcard campaigns with a picture of a baby and the text "Would you really want your baby seeking care in Chicago." The clear implication of such advertisements was that the only alternative – an unattractive alternative – to seeking pediatric services at Saint Francis is to seek such services in the Chicago area.

> **ANSWER:**     **OSF admits only that it is the sole provider of certain pediatric tertiary services in the Tri-County Area (as defined in the Complaint), and that its competitors for providing similarly sophisticated pediatric subspecialty care include providers in Chicago, Illinois and other cities outside of the alleged Tri-County Area.  OSF denies that it owns or operates a stand-alone children's hospital.  OSF lacks knowledge or information regarding what Methodist has been told by its "payor advisory group," and thus the averments set forth in the second sentence are denied.  OSF's advertising materials speak for themselves and any characterizations thereof are denied.  To the extent that the remaining averments set forth in Paragraph 62 are facts, they are denied.**

63.     Six commercial carriers within the relevant market represent approximately 86% of the fully insured commercial insurance market: BCBS, Aetna, Humana, Health Alliance, United Healthcare, and Coventry Health Care.  Saint Francis has engaged in exclusionary conduct with at least four of the six largest commercial health insurers in the Tri-County Area to force them to enter into an exclusionary contract.

> **ANSWER:**     **OSF lacks knowledge or information sufficient to respond to the averments of the first sentence, and they are accordingly denied.  To**

23

**the extent that the remaining averments set forth in Paragraph 63 are facts, they are denied.**

     1.    **BCBS**

64.    With reportedly 77,000 covered lives in its health insurance products, BCBS is the largest commercial health insurer in the Tri-County Area.  In 2010, BCBS's estimated dollar value of payments for inpatient and outpatient hospital services in the area is approximately $278 million in net patient hospital revenue.  Saint Francis captured approximately $207 million of that revenue.

    **ANSWER:**    **Admitted only that BCBS is the largest commercial health insurer in the Illinois.  OSF lacks knowledge or information sufficient to respond to the averments set forth in Paragraph 64 regarding BCBS's statistics and they are accordingly denied.  Any remaining averments are denied.**

65.    Saint Francis protects and grows its share of this revenue by preventing BCBS from opening its PPO network to Saint Francis' most significant competitors.  To accomplish this task, Saint Francis requires BCBS to negotiate one PPO contract that covers all of OSF's hospitals across Illinois.  This all-or-nothing approach means that BCBS either reaches an agreement that includes all of OSF Healthcare System hospitals in its PPO network, or fails to reach an agreement and none of the hospitals are included within its PPO network.  Despite its desire to open its PPO network to more hospitals, BCBS must bow to Saint Francis' market power because Saint Francis has achieved a dominant position in the Peoria market and BCBS's PPO product would be substantially less attractive to employers and individuals if it did not include Saint Francis in its PPO network.  As a result, it is extremely important for BCBS's PPO to maintain Saint Francis' in-network status.

    **ANSWER:**    **Denied.**

80577934v1  0943458

66.     In an effort to build a relationship and demonstrate its desire to be included in BCBS's PPO, Methodist signed an agreement with BCBS to participate in BCBS's HMO plan in January 2006. In 2007 and 2008, Methodist also enrolled its self-insured employee population with the BCBS HMO as a good faith effort to demonstrate the importance of BCBS to the Methodist organization.

>   **ANSWER:**    **OSF lacks knowledge or information sufficient to respond to the averments set forth in Paragraph 66 and they are accordingly denied.**

67.     HMOs are more restrictive than PPOs. They generally require that a patient choose a primary care physician, who will refer the patient to approved specialists. With some exceptions for emergency care, an HMO will not, without prior approval, cover medical expenses incurred when seeing a provider who is not contracted with the HMO. Also, HMOs are smaller and less profitable for providers than PPOs. Specifically, reimbursement rates are commonly less for HMOs than PPOs. Since 1998, PPOs have been steadily replacing HMOs. PPOs provide more flexibility to allow patients to see more doctors and visit any hospital.

>   **ANSWER:**    **OSF admits only that PPO plans have been more popular in Illinois with employers and consumers over the past decade than HMO plans and that PPO plans generally have fewer restrictions on utilization of providers than HMO plans. OSF cannot respond to the remaining averments set forth in Paragraph 67 because they consist of sweeping generalizations about numerous HMO and PPO plans whose terms and plan designs are not known by OSF. These averments are accordingly denied.**

68.     Despite these good faith overtures to building a relationship, BCBS has denied Methodist's repeated attempts to become a participating provider in the BCBS PPO network for one reason: Saint Francis' threat to leave the BCBS PPO network (along with the other hospitals in the OSF Healthcare System) should Methodist be admitted.

>   **ANSWER:**    **OSF denies that it or any of its constituent hospitals threatened to leave the BCBS PPO network should Methodist become part of the BCBS PPO. OSF lacks knowledge or information sufficient to**

80577934v1 0943458

**respond to the remaining averments of Paragraph 68, and they are accordingly denied.**

69.     On August 29, 2007, Methodist representatives met with BCBS representatives in Chicago, Illinois, to discuss, among other things, Methodist's desire to become an in-network provider to BCBS for its largest product, the PPO plan.  Specifically, Michael Bryant, Cal MacKay, Robert Quin, Tony Schierbeck and Jana Keyes, all of Methodist, met with Phil Lumpkin, Mick McCarty, Steve Hamman, Rick Alagretti, Joe Arango, and Bill Patton, all BCBS executives.

**ANSWER:     OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 69, and they are accordingly denied.**

70.     BCBS denied Methodist's request to become an in-network PPO provider and refused to reconsider its decision even after receiving letters from local brokers and employers supporting Methodist and imploring BCBS to enter into a PPO contract with Methodist because of its quality of service and desirability amongst employees.

**ANSWER:     OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 70, and they are accordingly denied.**

71.     On information and belief, BCBS denied Methodist's request because of pressure from Saint Francis.

**ANSWER:     Denied.**

72.     In 2008, Methodist continued to seek opportunities to contract with BCBS's PPO. On February 4, 2008, representatives of Methodist again met with BCBS executives to discuss Methodist's desire to become an in-network provider to the BCBS PPO.  Specifically, Michael Bryant, Cal MacKay, Rob Quin, Tony Schierbeck, Cathy Emanuel, and Jana Keyes, all of Methodist, met with Mick McCarty, Steve Hamman and Rick Alagretti, all BCBS executives. Another meeting was held with Mick McCarty on June 17, 2008.

80577934v1 0943458

**ANSWER:** **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 72, and they are accordingly denied.**

73.     The 2008 negotiations seemed very promising.  In February, BCBS requested that Methodist provide additional information regarding its regional relationships.  Then, on July 11, 2008, representatives from Methodist met with a contingent of executives from BCBS that included Lee Biederman, Joe Arango and Mick McCarty in a boardroom at Methodist.  During this meeting, Methodist agreed in principle to BCBS's PPO participating provider rates, one of the last significant items to resolve in such contract negotiations.

**ANSWER:** **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 73, and they are accordingly denied.**

74.     However, BCBS refused to contract with Methodist in 2008, stating that the reason was coercion from Saint Francis through threats to withdraw from the BCBS PPO network and to cause OSF Healthcare System hospitals in other areas of Illinois to withdraw as well.

**ANSWER:** **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 74, and they are accordingly denied.  By way of further response, OSF denies that it or any of its constituent hospitals threatened to withdraw from the BCBS PPO network or coerced BCBS into refusing to deal with Methodist.**

75.     In 2009, Methodist continued its pursuit of becoming a provider in BCBS's PPO product.

**ANSWER:** **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 75, and they are accordingly denied.**

76.     On February 12, 2009, representatives from Methodist met with representatives from BCBS to discuss possible admission into the PPO.  A week later a State Farm representative informed Methodist that it supported an expansion of BCBS's PPO in Peoria (i.e., inclusion of Methodist) and that it intended to relay its sentiment to BCBS.

80577934v1 0943458

**ANSWER:** OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 76, and they are accordingly denied.

77.     In March 2009, Methodist reaffirmed its interest in negotiating a contract with BCBS's PPO.  Again the discussions progressed to the point that Methodist agreed to the participating provider rates as proposed by BCBS.

**ANSWER:** OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 77, and they are accordingly denied.

78.     On March 18, 2009, Michael Bryant wrote to Steve Hamman and Mick McCarty of BCBS to inform them of a potential new development that would alter the landscape of the market in Peoria.  Jim Moore of OSF Healthcare System spoke to Methodist's board of directors about his proposal to acquire Methodist.  As a result, Bryant explained to Hamman and McCarty that he needed to speak with them about the potential of Methodist entering into BCBS's PPO and expressed the importance of such a contract on Methodist's decisions for its future.

**ANSWER:** OSF admits only that Mr. Moore spoke to Methodist's Board of Directors regarding the possibility  of a mutually beneficial potential merger of OSF and Methodist.  OSF lacks knowledge or information sufficient to respond to the remaining averments of Paragraph 78, and they are accordingly denied.

79.     On March 20, 2009, BCBS informed Methodist that it intended to send a proposal to Saint Francis indicating that BCBS was moving toward having PPO contracts with multiple hospitals in each of its markets.  According to BCBS, if Saint Francis accepted the proposal, then Methodist would be in the PPO.  BCBS also indicated that it expected Saint Francis to again threaten to leave the BCBS PPO network.

**ANSWER:** OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 79, and they are accordingly denied.  By way of further response, OSF denies that it or any of its constituent hospitals threatened to withdraw from the BCBS PPO network or coerced BCBS into refusing to deal with Methodist.

80577934v1  0943458

80.     In August 2009, however, BCBS notified Methodist that it would not be a participating provider in Methodist's PPO for 2010 and 2011.  BCBS explained that it could not offer Methodist an in-network contract because Saint Francis threatened to withdraw its hospital from BCBS's PPO network if Methodist became a participating provider.

> **ANSWER:     OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 80, and they are accordingly denied.  By way of further response, OSF denies that it or any of its constituent hospitals threatened to withdraw from the BCBS PPO network or coerced BCBS into refusing to deal with Methodist.**

81.     In late August 2010, Paul Gaeto of Caterpillar spoke with Karen Atwood of BCBS to inform her of Caterpillar's plans to expand its network of providers in Peoria and to explain why he believed an open competitive market was better for the community.  Although Atwood agreed with the philosophy of having more providers in Peoria, she explained that BCBS was restricted because Saint Francis has an exclusivity provision in its contract with BCBS and that it is a requirement for doing business with them.

> **ANSWER:     OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 81, and they are accordingly denied.  By way of further response, OSF denies that it conditioned doing business with BCBS upon the exclusion of Methodist or any other provider from BCBS's networks.**

82.     On January 28, 2011, Tony Schierbeck of Methodist met with Steve Hamman for lunch in Chicago, Illinois.  During their lunch meeting, they discussed possible opportunities for Methodist to become a participating provider in BCBS's PPO.  Hamman indicated that Saint Francis' threat to leave the network is what has prevented BCBS from contracting with Methodist.

> **ANSWER:     OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 82, and they are accordingly denied.  By way of further response, OSF denies that it or any of its constituent hospitals threatened to withdraw from the BCBS PPO network or**

80577934v1  0943458

**coerced BCBS into refusing participation by Methodist in the PPO or otherwise.**

83.     On November 14, 2011, representatives from Methodist met with a contingent of executives from BCBS that included Steve Hamman (Vice President, Provider Services), Gail Larsen (Divisional Vice President, Provider Services), Donna Levigne (Senior Director of Professional Network Services), Joe Sternberg (Manager of Network Development), Joe Arango (Divisional Vice President, Provider Contracting), Lee Biederman (Senior Director, Hospital Contracting & Reimbursement), William Patton (Divisional Vice President, Network Management), Rich Rappenecker (Sales Director), and Terry Shook (Director, Market Development).

> **ANSWER:**     **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 83, and they are accordingly denied.**

84.     In August 2012, Methodist reaffirmed its interest in negotiating a PPO contract with BCBS by sending a certified letter to BCBS requesting that Methodist be considered as a PPO provider for 2013.  Again, BCBS refused to contract with Methodist.

> **ANSWER:**     **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 84, and they are accordingly denied.**

85.     BCBS executives Mick McCarty, Rich Rappenecker, and Steve Hamman have informed Tony Schierbeck on several occasions that Saint Francis has threatened to terminate its participation with BCBS's PPO if BCBS contracts with Methodist.

> **ANSWER:**     **OSF lacks knowledge or information sufficient to respond to the averments of Paragraph 85, and they are accordingly denied.  By way of further response, OSF denies that it or any of its constituent hospitals threatened to withdraw from the BCBS PPO network or coerced BCBS into refusing to deal with Methodist.**

> **2.     Humana**

80577934v1  0943458

86.     In 2008, OSF Healthcare System sold its health plan, OSF Health Plans, Inc., to Humana in a manner which precluded Methodist from serving Humana's covered lives. Specifically, Saint Francis included a "most favored nation" pricing clause and contractual language forbidding Humana from contracting with Methodist for a period of six years. Before and at the time of the acquisition of OSF Health Plans, Inc., Methodist was a provider in Humana's network and immediately after the acquisition Humana dropped Methodist from its network.

> **ANSWER:**    **Admitted, except that OSF lacks knowledge or information as to when Humana terminated its relationship with Methodist and thus the averments as to the timing of this contract termination are denied. By way of further response, before acquiring OSF Health Plans, Inc. from OSF, Humana had a minimal market presence.**

### 3.     Aetna

87.     In 2010, Saint Francis negotiated an agreement with Aetna that resulted in Methodist being dropped from its networks. According to Aetna, it terminated its 23 year relationship with Methodist because it needed Saint Francis as an in-network provider to compete for BCBS beneficiaries.

> **ANSWER:**    **OSF admits only that it entered into a contract with Aetna in 2010, which is a document that speaks for itself. OSF lacks knowledge or information sufficient to respond to the remaining averments of Paragraph 87, and they are accordingly denied.**

### 4.     Health Alliance

88.     In 2010, Health Alliance was forced to terminate its nine year relationship with Methodist after OSF Healthcare System acquired the Carle Clinic physicians in Bloomington, Illinois. As part of its acquisition, OSF Healthcare System required Health Alliance to drop Methodist from its network and replace it with Saint Francis.

> **ANSWER:**    **OSF admits only that it acquired the Carle Clinic physician practice in Bloomington, Illinois and that OSF subsequently entered into a**

80577934v1 0943458

**contract with Health Alliance, which is a document that speaks for itself. The remaining averments of Paragraph 88 are denied.**

**B.      Saint Francis' Exclusionary Conduct Forecloses The Most Profitable Health Insurance Contracts**

89.      Saint Francis has effectively foreclosed many of the most profitable health insurance contracts in the Tri-County Area. These contracts are crucial for Saint Francis' rivals to effectively compete.

**ANSWER:     Denied.**

90.      Hospital prices for services sold to privately insured patients are almost always set through negotiations with private insurers. The hospitals that contract with insurers are considered "in-network" providers. Inclusion in health insurer networks is crucial because patients generally seek healthcare services from "in-network" providers because insurers provide substantial financial incentives (e.g., lower cost sharing) to their policy holders to visit hospitals within their provider networks. For example, insurers require their policy holders to make large co-insurance payments if they visit an out-of-network provider or a non-participating provider. In fact, policy holders not only pay a higher co-insurance rate if they visit an out-of-network provider, they also might be "balance billed" by the provider for the difference between their insurer's "allowed amount" and the provider's full list charges. These incentives are strong enough that policy holders rarely choose out-of-network hospitals for non-emergency care.

**ANSWER:     OSF admits only that commercial payors often contract with health care providers to form networks of providers for particular health plan products; that such products are often designed to provide incentives to patients to use providers within the network; and that in-network providers are typically restricted by contract from balance billing patients for services covered by the applicable health plan. OSF cannot respond to the remaining averments set forth in Paragraph 90 because they consist of sweeping generalizations about numerous health plans whose terms and plan designs are not known by OSF. These averments are accordingly denied.**

80577934v1 0943458

91.     In exchange for being an in-network provider and having access to the associated patient volume, hospitals offer discounts, often 50% or more, off their full charges to the insurer. Hospitals are willing to offer such discounts for two reasons: (a) the charges are often far higher than marginal cost; and (b) being part of a managed care network can significantly increase patient volumes.  On the other hand, a hospital can expect to lose a significant amount of business if it is removed from or denied membership in an insurer's network.

**ANSWER:**     **OSF admits only that health care providers typically offer prices below gross billed charges in exchange for the increased volume that being an in-network provider can offer and that gross billed charges are typically set at an above-cost level.  OSF cannot respond to the remaining averments set forth in Paragraph 91 because they consist of sweeping generalizations about numerous health plans whose terms, plan designs, and participating provider contract terms are not known by OSF.  These averments are accordingly denied.**

92.     By effectively denying access to critical in-network status, Saint Francis substantially reduces the number of patients who would otherwise use Methodist and other Saint Francis competitors.  More importantly, Saint Francis' exclusionary conduct effectively denies access to a substantial percentage of the most profitable patients (i.e., those with commercial health insurance).

**ANSWER:**     **Denied.**

93.     It is substantially more profitable for hospitals to serve patients with commercial health insurance than to serve patients covered by Medicare, Medicaid, or TRICARE because government plans pay significantly less than commercial health insurers.  This is true in the Tri-County Area.

**ANSWER:**     **Admitted.**

94.     As a result, patients covered by government plans are not adequate substitutes for commercially insured patients.  In fact, Saint Francis, like many other hospitals, depends on

80577934v1 0943458

payments from commercial health insurers to compensate for the comparatively low payments it receives from government plans. The low payment rates offered by government payers provide little or no contribution margin to offset Saint Francis' overhead expenses.

**ANSWER:** **Admitted.**

95.      Here, Saint Francis has forced at least four of the six largest commercial insurance companies in the area, including BCBS, which is by far the largest health insurer, to enter into an exclusionary contract. When combined with the substantial entry barriers associated with the market (e.g., capital costs, certificate of need applications, etc.), Saint Francis' exclusionary conduct effectively forecloses 60% of the fully insured commercial market in the Tri-County Area. Moreover, given Saint Francis' status as the dominant provider of outpatient services, there is nothing to suggest this percentage would be meaningfully lower in the outpatient surgical services market.

**ANSWER:** **Denied.**

96.      Because insurers that have exclusionary contracts with Saint Francis pay the highest rates, these insurers account for a substantial share of the revenues that would otherwise be available to competing healthcare providers.

**ANSWER:** **Denied.**

**C.      Saint Francis' Exclusionary Conduct Has Caused Substantial Anticompetitive Effects**

97.      Saint Francis' exclusionary conduct has reduced competition and enabled it to maintain its substantial market power in the provision of inpatient hospital services and outpatient surgical services. Its conduct will continue to cause anticompetitive effects in the market by foreclosing the most profitable health insurance contacts and eliminating patient choice/access to low cost high quality services provided by its rivals, such as Methodist.

34

**ANSWER:    Denied.**

98.    The financial dependency of hospital providers on commercial health insurers is well-known.  Indeed, the ability of a hospital provider to compete for commercially insured patients, which occurs in large part through competition for contracts with insurers, is a key determinant of a hospital's overall profitability, ability to invest, and long-term sustainability.

**ANSWER:    Admitted.**

99.    By foreclosing Methodist from over 60% of the fully insured commercial insurance market (i.e., potential patient volume) in the area, Saint Francis is undermining and threatening the long-term stability of its largest and chief competitor.  The smaller hospitals in the region that do provide services do not meaningfully compete with Saint Francis in a way that could reduce its bargaining power with commercial health insurers.  As a result, when Methodist is foreclosed from a substantial portion of the commercial insurance market, there is less competition, which means higher prices and fewer choices for consumers.

**ANSWER:    OSF admits only that Methodist is the second largest hospital in the Tri-County Area (as defined in the Complaint).   The remaining averments set forth in Paragraph 99 are denied.**

100.    By effectively preventing most commercial health insurers from including in their networks other inpatient and outpatient facilities, such as Methodist, Saint Francis has (a) delayed and prevented the expansion and entry of its competitors, who generally offer lower prices, leading to higher healthcare costs and higher health insurance premiums; and (b) reduced quality competition between Saint Francis and its competitors thereby preventing the public from benefiting from the quality and lower cost services they provide.

**ANSWER:    Denied.**

**1.    Saint Francis' exclusionary conduct has delayed and prevented expansion of existing competitors and entry of competitors**

101.     Saint Francis' conduct has likely delayed and prevented competitors from expanding in or entering into the relevant markets, thereby leading to higher healthcare costs and higher insurance premiums.  As alleged above, Saint Francis' exclusionary conduct effectively prevents significant commercial health insurers from contracting with many of Saint Francis' rivals, including Methodist.  If Saint Francis had not imposed its exclusionary contracts, these insurers likely would have contracted with Methodist and other competitors in the Tri-County Area (and with providers that otherwise might have entered the market), giving those competitors in-network status and access to the patients covered by commercial health insurers (i.e., the most profitable patients).  Because Saint Francis is the most expensive hospital in the area, this drives up healthcare costs and harms consumers.

**ANSWER:**     **Denied.**

102.     Furthermore, Saint Francis' conduct adversely impacts physician referral patterns and hospital affiliations.  Physicians treating patients covered by commercial health insurers that have been forced into exclusionary contracts by Saint Francis likely have referred more patients to Saint Francis, and more patients likely have chosen to use Saint Francis.  Physician productivity mandates that they fill their daily schedule.  Many doctors engage in "block-booking," finding it most efficient to perform all of a given day's surgeries and other procedures at the same facility.  If they cannot see the majority of their commercial insurance patients at a facility, such as Methodist, they will shift their patients elsewhere to try to maximize productivity.  Thus, absent Saint Francis' exclusionary conduct, its competitors would receive higher patient volumes and utilization, increased revenues, and substantially higher profits.

**ANSWER:**     **Denied.**

103.     The higher volumes and profits obtained from serving additional patients covered by commercial health insurers likely would have allowed Methodist and other competitors to

80577934v1  0943458

expand.  This expansion would enable the competitors to compete more effectively with Saint Francis, likely resulting in more competition, lower healthcare costs, and greater quality competition.

**ANSWER:**  **Denied.**

104.    Saint Francis' exclusionary conduct also inhibits new providers from entering the market.  Potential entrants are dissuaded from entering the market because they cannot obtain contracts with many of the commercial health insurers who have customers in the market.

**ANSWER:**  **Denied.**

105.    By limiting the expansion and/or entry of competitors, Saint Francis' exclusionary conduct has helped it maintain its monopoly and likely increased the cost of providing medical care to residents in the Tri-County Area.  Because Saint Francis' exclusionary conduct limited competitors' expansion and entry, and thereby reduced insurers' bargaining leverage with Saint Francis, Saint Francis has been able to demand higher prices from commercial health insurers free from competitive discipline.  For example, Saint Francis' adjusted average charge across all Medicare Severity Diagnosis Related Groups ("MS-DRGs") increased nearly 50% from $21,188 in 2006 to $33,077 in 2011.  In comparison, the average charges of Saint Francis' primary competitor, Methodist, over the same period only increased 20% from $20,038 to $24,220.

**ANSWER:**  **Denied, except for the averments regarding specific charge levels. OSF lacks sufficient knowledge and information as to the source(s) and methodology used by Plaintiff to generate these numbers to respond to those averments, and they are accordingly denied.**

106.    The higher payment rates demanded by Saint Francis from commercial health insurers are borne in part by Tri-County Area employers and residents in the form of higher insurance premiums.

80577934v1  0943458

**ANSWER:**     **Denied.**

> **2.** **The exclusionary conduct has reduced quality competition between Saint Francis and its competitors**

107.     Patients and physicians often choose among hospitals and other healthcare providers based on the provider's quality and reputation, including quality of care and quality of service.  Due to the financial penalty associated with using out-of-network providers, patients with health insurance provided by insurers with exclusionary contracts are less likely to choose out-of-network providers, even if the patient believes the out-of-network provider offers superior quality to Saint Francis.

> **ANSWER:**     **OSF admits only that patient and physician choice of hospital providers may be influenced by many factors, including but not limited to quality, reputation, and whether a hospital is in-network for the patient's health plan.  The remaining averments set forth in Paragraph 107 are denied.**

108.     If Saint Francis' competitors became in-network providers for more commercially insured patients, each of those competitors would have the incentive to make additional improvements in quality to attract those patients to its facility.  Saint Francis, in turn, also would have the incentive to improve its quality to keep patients from choosing another competitor.  Therefore, absent the exclusionary conduct, Saint Francis and its competitors would have increased incentives to make additional quality improvements, and the overall level of quality of healthcare in the Tri-County Are likely would be higher.  Moreover, such quality improvements would benefit all patients, not just those with commercial health insurance.

> **ANSWER:**     **Denied.  By way of further response, OSF always works hard to improve the quality of its services and to fulfill its mission regardless of the activities of other providers.  It is OSF's mission, not the actions of other providers, that determines OSF's investments and development.**

> **D.** **Saint Francis' Exclusionary Conduct Lacks A Valid Procompetitive Business Justification**

109. There is no valid precompetitive business justification for Saint Francis' exclusionary conduct. Saint Francis did not use its conduct to achieve any economies of scale or other efficiencies as a result of any additional patient volume that it obtained from the exclusionary contracts.

**ANSWER:** **Denied.**

## COUNT I
## EXCLUSIVE DEALING – SHERMAN ACT SECTION 1
### (15 U.S.C. § 1)

110. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:** **OSF hereby incorporates its responses to Paragraphs 1-109 as if fully set forth herein.**

111. Saint Francis possesses market power in the relevant product markets in the Tri-County Area.

**ANSWER:** **The averments set forth in Paragraph 111 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 111 are facts, they are denied.**

112. Six commercial carriers within Tri-County Area represent approximately 86% of the fully insured commercial insurance market.

**ANSWER:** **OSF lacks knowledge or information sufficient to respond to the averments set forth in Paragraph 112 and they are accordingly denied.**

113. Saint Francis has coerced at least four of the six largest commercial health insurers in the Tri-County Area to enter into exclusionary contracts.

**ANSWER:** **Denied.**

114. Saint Francis' exclusionary contracts effectively foreclose 60% of the fully insured commercial market in the Tri-County Area.

80577934v1 0943458

> **ANSWER:** The averments set forth in Paragraph 114 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 114 are facts, they are denied.

115. Saint Francis' exclusionary contracts with BCBS and other commercial payers foreclose a substantial portion of this market to Methodist.

> **ANSWER:** The averments set forth in Paragraph 115 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 115 are facts, they are denied.

116. Saint Francis' exclusionary contracts have an adverse effect on competition in the Tri-County Area. The loss of this volume lessens Methodist's ability to act as a pro-competitive, constraining influence on Saint Francis.

> **ANSWER:** The averments set forth in Paragraph 116 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 116 are facts, they are denied.

117. Methodist has been injured and suffered damages as a result of Saint Francis' exclusionary conduct.

> **ANSWER:** The averments set forth in Paragraph 117 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 117 are facts, they are denied.

118. Saint Francis' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

> **ANSWER:** The averments set forth in Paragraph 118 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 118 are facts, they are denied.

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT II
## ATTEMPTED MONOPOLIZATION – SHERMAN ACT SECTION 2
### (15 U.S.C. § 2)

119. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

40

**ANSWER:** OSF hereby incorporates its responses to Paragraphs 1-118 as if fully set forth herein.

120. Saint Francis specifically intended to monopolize the relevant product markets.

**ANSWER:** The averments set forth in Paragraph 120 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 120 are facts, they are denied.

121. Saint Francis' attempts to harm Methodist, including its imposition of exclusionary contracts for medical services with commercial health insurers, constitute an improper attempt to use its significant current market power in the relevant product markets for the specific purpose of monopolizing those product markets in the Tri-County Area.

**ANSWER:** The averments set forth in Paragraph 121 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 121 are facts, they are denied.

122. In furtherance of this attempt, Saint Francis has engaged in specific anticompetitive conduct, as alleged herein, by imposing exclusionary contracts on commercial health insurers to eliminate Methodist's access to those beneficiaries. If not enjoined, Saint Francis will continue to engage in exclusionary conduct with commercial health insurers, which conduct would further injure Methodist and other rivals.

**ANSWER:** The averments set forth in Paragraph 122 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 122 are facts, they are denied.

123. Saint Francis has market power by virtue of its significant share of the market for inpatient hospital services and outpatient surgical services in the Tri-County Area, and its ability to exclude competitors or minimize competition. Should it be successful in maintaining its desired exclusionary conduct with commercial health insurers, there is a dangerous probability it will succeed in achieving monopoly power in the relevant product markets in the Tri-County Area.

80577934v1 0943458

**ANSWER:** **The averments set forth in Paragraph 123 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 123 are facts, they are denied.**

124. Methodist has already suffered antitrust injury because of Saint Francis' attempt to monopolize. Should Saint Francis be successful in improperly gaining a monopoly, Methodist will further be injured by virtue of the anticompetitive conduct that will cause it to exit and suffer irreparable harm.

**ANSWER:** **The averments set forth in Paragraph 124 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 124 are facts, they are denied.**

125. Saint Francis' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:** **The averments set forth in Paragraph 125 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 125 are facts, they are denied.**

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT III
## MONOPOLIZATION – SHERMAN ACT SECTION 2
### (15 U.S.C. § 2)

126. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:** **OSF hereby incorporates its responses to Paragraphs 1-125 as if fully set forth herein.**

127. Saint Francis possesses substantial market power in the relevant product markets in the Tri-County Area.

**ANSWER:** **The averments set forth in Paragraph 127 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 127 are facts, they are denied.**

80577934v1 0943458

128.    Saint Francis has willfully maintained and abused its market power in the relevant markets through its exclusionary conduct with commercial health insurers.

**ANSWER:**    **The averments set forth in Paragraph 128 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 128 are facts, they are denied.**

129.    The exclusionary contracts Saint Francis has imposed on commercial health insurers constitute an act by which Saint Francis willfully exploits and maintains its market power in the relevant product markets in the Tri-County Area.

**ANSWER:**    **The averments set forth in Paragraph 129 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 129 are facts, they are denied.**

130.    There is no valid procompetitive business justification for Saint Francis' exclusionary conduct.  If commercial health insurers, such as BCBS, were acting in their own economic self-interest and without pressure from Saint Francis, they would choose to contract with Methodist.

**ANSWER:**    **The averments set forth in Paragraph 130 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 130 are facts, they are denied.**

131.    Methodist has been injured and suffered damages as a result of Saint Francis' exclusionary conduct.

**ANSWER:**    **The averments set forth in Paragraph 131 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 131 are facts, they are denied.**

132.    Saint Francis' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**    **The averments set forth in Paragraph 132 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 132 are facts, they are denied.**

80577934v1  0943458

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT IV
## EXCLUSIVE DEALING – ILLINOIS ANTITRUST ACT
## (740 ILCS 10/3)

133.    Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:**    **OSF hereby incorporates its responses to Paragraphs 1-132 as if fully set forth herein.**

134.    Saint Francis possesses market power in the relevant product markets in the Tri-County Area.

**ANSWER:**    **The averments set forth in Paragraph 134 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 134 are facts, they are denied.**

135.    Six commercial carriers within Tri-County Area represent approximately 86% of the fully insured commercial insurance market.

**ANSWER:**    **OSF lacks knowledge or information sufficient to respond to the averments set forth in Paragraph 135 and they are accordingly denied.**

136.    Saint Francis has coerced at least four of the six largest commercial health insurers in the Tri-County Area to enter into exclusionary contracts.

**ANSWER:**    **The averments set forth in Paragraph 136 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 136 are facts, they are denied.**

137.    Saint Francis' exclusionary contracts effectively foreclose 60% of the fully insured commercial market in the Tri-County Area.

**ANSWER:**    **The averments set forth in Paragraph 137 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 137 are facts, they are denied.**

80577934v1 0943458

138.     Saint Francis' exclusionary contracts with BCBS and other commercial payers foreclose a substantial portion of this market to Methodist.

> **ANSWER:**     **The averments set forth in Paragraph 138 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 138 are facts, they are denied.**

139.     Saint Francis' exclusionary contracts have an adverse effect on competition in the Tri-County Area.  The loss of this volume lessens Methodist's ability to act as a pro-competitive, constraining influence on Saint Francis.

> **ANSWER:**     **The averments set forth in Paragraph 139 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 139 are facts, they are denied.**

140.     Methodist has been injured and suffered damages as a result of Saint Francis' exclusionary conduct.

> **ANSWER:**     **The averments set forth in Paragraph 140 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 140 are facts, they are denied.**

141.     Saint Francis' conduct violates the Illinois Antitrust Act, 740 ILCS 10/3.

> **ANSWER:**     **The averments set forth in Paragraph 141 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 141 are facts, they are denied.**

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT V
## ATTEMPTED MONOPOLIZATION – ILLINOIS ANTITRUST ACT
### (740 ILCS 10/3)

142.     Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

> **ANSWER:**     **OSF hereby incorporates its responses to Paragraphs 1-141 as if fully set forth herein.**

45

143.    Saint Francis' attempts to harm Methodist, including its imposition of exclusionary contracts for medical services with commercial health insurers, constitute an improper attempt to use its significant current market power in the relevant product markets for the specific purpose of monopolizing those product markets in the Tri-County Area.

**ANSWER:**    **The averments set forth in Paragraph 143 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 143 are facts, they are denied.**

144.    In furtherance of this attempt, Saint Francis has engaged in specific anticompetitive conduct, as alleged herein, by imposing exclusionary contracts on commercial health insurers to eliminate Methodist's access to those beneficiaries. If not enjoined, Saint Francis will continue to engage in exclusionary conduct with commercial health insurers, which conduct would further injure Methodist and other rivals.

**ANSWER:**    **The averments set forth in Paragraph 144 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 144 are facts, they are denied.**

145.    Saint Francis has market power by virtue of its significant share of the market for inpatient hospital services and outpatient surgical services in the Tri-County Area, and its ability to exclude competitors or minimize competition. Should it be successful in maintaining its desired exclusionary conduct with commercial health insurers, there is a dangerous probability it will succeed in achieving monopoly power in the relevant product markets in the Tri-County Area.

**ANSWER:**    **The averments set forth in Paragraph 145 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 145 are facts, they are denied.**

146.    Methodist has already suffered antitrust injury because of Saint Francis' attempt to monopolize. Should Saint Francis be successful in improperly gaining a monopoly, Methodist

80577934v1 0943458

will further be injured by virtue of the anticompetitive conduct that will cause it to exit and suffer irreparable harm.

> **ANSWER:** **The averments set forth in Paragraph 146 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 146 are facts, they are denied.**

147. Saint Francis' conduct violates the Illinois Antitrust Act, 740 ILCS 10/3.

> **ANSWER:** **The averments set forth in Paragraph 147 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 147 are facts, they are denied.**

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT VI
## MONOPOLIZATION – ILLINOIS ANTITRUST ACT
## (740 ILCS 10/3)

148. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

> **ANSWER:** **OSF hereby incorporates its responses to Paragraphs 1-147 as if fully set forth herein.**

149. Saint Francis possesses substantial market power in the relevant product markets in the Tri-County Area.

> **ANSWER:** **The averments set forth in Paragraph 149 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 149 are facts, they are denied.**

150. Saint Francis has willfully maintained and abused its market power in the relevant markets through its exclusionary conduct with commercial health insurers.

> **ANSWER:** **The averments set forth in Paragraph 150 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 150 are facts, they are denied.**

80577934v1 0943458

151.   The exclusionary contracts Saint Francis has imposed on commercial health insurers constitute an act by which Saint Francis willfully exploits and maintains its market power in the relevant product markets in the Tri-County Area.

>    **ANSWER:**   **The averments set forth in Paragraph 151 are conclusions of law to which no response is required.   To the extent that the remaining averments set forth in Paragraph 151 are facts, they are denied.**

152.   There is no valid procompetitive business justification for Saint Francis' exclusionary conduct.   If commercial health insurers, such as BCBS, were acting in their own economic self-interest and without pressure from Saint Francis, they would choose to contract with Methodist.

>    **ANSWER:**   **The averments set forth in Paragraph 152 are conclusions of law to which no response is required.   To the extent that the remaining averments set forth in Paragraph 152 are facts, they are denied.**

153.   Methodist has been injured and suffered damages as a result of Saint Francis' exclusionary conduct.

>    **ANSWER:**   **The averments set forth in Paragraph 153 are conclusions of law to which no response is required.   To the extent that the remaining averments set forth in Paragraph 153 are facts, they are denied.**

154.   Saint Francis' conduct violates the Illinois Antitrust Act, 740 ILCS 10/3.

>    **ANSWER:**   **The averments set forth in Paragraph 154 are conclusions of law to which no response is required.   To the extent that the remaining averments set forth in Paragraph 154 are facts, they are denied.**

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE
## ECONOMIC ADVANTAGE – BCBS

155.   Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

48

**ANSWER:** OSF hereby incorporates its responses to Paragraphs 1-154 as if fully set forth herein.

156. Methodist had a reasonable expectation of entering into a valid business relationship to become a PPO provider for beneficiaries of BCBS health plans.

**ANSWER:** The averments set forth in Paragraph 156 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 156 are facts, they are denied.

157. Saint Francis knew of Methodist's reasonable expectancy.

**ANSWER:** The averments set forth in Paragraph 157 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 157 are facts, they are denied.

158. Saint Francis, in the many ways described herein, intentionally and unjustifiably interfered to cause a termination of Methodist's reasonable and legitimate expectancy from being fulfilled.

**ANSWER:** The averments set forth in Paragraph 158 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 158 are facts, they are denied.

159. Saint Francis acted wrongfully, with the intent to harm Methodist.

**ANSWER:** The averments set forth in Paragraph 159 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 159 are facts, they are denied.

160. Saint Francis' tortious conduct harmed Methodist in several ways described herein.

**ANSWER:** The averments set forth in Paragraph 160 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 160 are facts, they are denied.

161. Methodist has been injured and suffered damages as a result of Saint Francis' interference.

80577934v1 0943458

**ANSWER:** The averments set forth in Paragraph 161 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 161 are facts, they are denied.

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE
## ECONOMIC ADVANTAGE – AETNA

162. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:** OSF hereby incorporates its responses to Paragraphs 1-161 as if fully set forth herein.

163. Methodist had a reasonable expectation of entering into a valid business relationship to become a provider for beneficiaries of Aetna health plans.

**ANSWER:** The averments set forth in Paragraph 163 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 163 are facts, they are denied.

164. Saint Francis knew of Methodist's reasonable expectancy.

**ANSWER:** The averments set forth in Paragraph 164 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 164 are facts, they are denied.

165. Saint Francis, in the many ways described herein, intentionally and unjustifiably interfered to cause a termination of Methodist's reasonable and legitimate expectancy from being fulfilled.

**ANSWER:** The averments set forth in Paragraph 165 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 165 are facts, they are denied.

166. Saint Francis acted wrongfully, with the intent to harm Methodist.

80577934v1 0943458

**ANSWER:** The averments set forth in Paragraph 166 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 166 are facts, they are denied.

167. Saint Francis' tortious conduct harmed Methodist in several ways described herein.

**ANSWER:** The averments set forth in Paragraph 167 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 167 are facts, they are denied.

168. Methodist has been injured and suffered damages as a result of Saint Francis' interference.

**ANSWER:** The averments set forth in Paragraph 168 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 168 are facts, they are denied.

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT IX
## TORTIOUS INTERFERENCE WITH PROSPECTIVE
## ECONOMIC ADVANTAGE – HEALTH ALLIANCE

169. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:** OSF hereby incorporates its responses to Paragraphs 1-168 as if fully set forth herein.

170. Methodist had a reasonable expectation of entering into a valid business relationship to become a provider for beneficiaries of Health Alliance health plan.

**ANSWER:** The averments set forth in Paragraph 170 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 170 are facts, they are denied.

171. Saint Francis knew of Methodist's reasonable expectancy.

80577934v1 0943458

**ANSWER:** The averments set forth in Paragraph 171 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 171 are facts, they are denied.

172.    Saint Francis, in the many ways described herein, intentionally and unjustifiably interfered to cause a termination of Methodist's reasonable and legitimate expectancy from being fulfilled.

**ANSWER:** The averments set forth in Paragraph 172 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 172 are facts, they are denied.

173.    Saint Francis acted wrongfully, with the intent to harm Methodist.

**ANSWER:** The averments set forth in Paragraph 173 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 173 are facts, they are denied.

174.    Saint Francis' tortious conduct harmed Methodist in several ways described herein.

**ANSWER:** The averments set forth in Paragraph 174 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 174 are facts, they are denied.

175.    Methodist has been injured and suffered damages as a result of Saint Francis' interference.

**ANSWER:** The averments set forth in Paragraph 175 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 175 are facts, they are denied.

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT X
## TORTIOUS INTERFERENCE WITH PROSPECTIVE
## ECONOMIC ADVANTAGE – HUMANA

176.    Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein

52

> **ANSWER:**   OSF hereby incorporates its responses to Paragraphs 1-176 as if fully set forth herein.

177.    Methodist had a reasonable expectation of entering into a valid business relationship to become a provider for beneficiaries of Humana health plan.

> **ANSWER:**   The averments set forth in Paragraph 177 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 177 are facts, they are denied.

178.    Saint Francis knew of Methodist's reasonable expectancy.

> **ANSWER:**   The averments set forth in Paragraph 178 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 178 are facts, they are denied.

179.    Saint Francis, in the many ways described herein, intentionally and unjustifiably interfered to cause a termination of Methodist's reasonable and legitimate expectancy from being fulfilled.

> **ANSWER:**   The averments set forth in Paragraph 179 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 179 are facts, they are denied.

180.    Saint Francis acted wrongfully, with the intent to harm Methodist.

> **ANSWER:**   The averments set forth in Paragraph 180 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 180 are facts, they are denied.

181.    Saint Francis' tortious conduct harmed Methodist in several ways described herein.

> **ANSWER:**   The averments set forth in Paragraph 181 are conclusions of law to which no response is required To the extent that the remaining averments set forth in Paragraph 181 are facts, they are denied.

182.    Methodist has been injured and suffered damages as a result of Saint Francis' interference.

80577934v1 0943458

**ANSWER:** The averments set forth in Paragraph 182 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 182 are facts, they are denied.

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

## COUNT XI
## ILLINOIS CONSUMER FRAUD ACT
### (815 ILCS 505/10a)

183. Methodist incorporates its allegations in paragraphs 1-109 as if fully stated herein.

**ANSWER:** OSF hereby incorporates its responses to Paragraphs 1-182 as if fully set forth herein.

184. Pursuant to Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, it is an unfair or deceptive act or practice to use or employ any deception, fraud, false pretense, false promise, misrepresentation, or to conceal, suppress, or omit any material fact with the intent that others rely on the concealment, suppression, or omission, regardless of whether any person has in fact been misled, deceived, or damaged thereby.

**ANSWER:** The averments set forth in Paragraph 184 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 184 are facts, they are denied.

185. Saint Francis committed unfair and deceptive acts and practices in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2 by

    a. Engaging in improper and unlawful business practices that deprived Methodist of BCBS's business; and

    b. Violating federal and state antitrust laws.

**ANSWER:** The averments set forth in Paragraph 185 are conclusions of law to which no response is required. To the extent that the remaining averments set forth in Paragraph 185 are facts, they are denied.

80577934v1 0943458

186.     Saint Francis engaged in the conduct complained of in the course of trade and commerce.

    **<u>ANSWER:</u>**    **The averments set forth in Paragraph 186 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 186 are facts, they are denied.**

187.     Methodist has suffered actual damages as a result of Saint Francis' deceptive practices, as Methodist has been deprived of several million dollars of revenue for medical services for BCBS PPO beneficiaries that it would otherwise have expected to receive but for Saint Francis' unfair and deceptive acts and practices.

    **<u>ANSWER:</u>**    **The averments set forth in Paragraph 187 are conclusions of law to which no response is required.  To the extent that the remaining averments set forth in Paragraph 187 are facts, they are denied.**

188.     A copy of this complaint has been mailed to the Attorney General of the State of Illinois, pursuant to 815 ILCS 505/10a (d).

    **<u>ANSWER:</u>**    **OSF lacks knowledge or information sufficient to respond to the averments set forth in Paragraph 188 and they are accordingly denied.**

WHEREFORE, the defendant, OSF HEALTHCARE SYSTEM, requests that this Court dismiss the Complaint against it and enter judgment in its favor along with the costs it has incurred.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

There is no direct or proximate causal connection between any claim of harm or injury alleged by Plaintiff and any acts alleged to have been committed by OSF.

80577934v1  0943458

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because any conduct engaged in by OSF has been reasonable and based upon independent, legitimate, procompetitive business and economic justifications.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because OSF's alleged conduct was privileged, justified, and/or excused.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because of OSF's non-profit status.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to plead substantial foreclosure of a properly defined market or submarket.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff has failed to plead that OSF's conduct substantially lessened competition within any properly defined market or submarket.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff has not suffered antitrust injury or damages. Plaintiff's claims are barred, in whole or in part, because it has not suffered an injury in fact.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because their damages, if any, are speculative, and because of the impossibility of ascertaining and allocating such damages.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches, waiver, estoppel and/or unclean hands.

80577934v1 0943458

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claim for recovery of damages is barred, in whole or in part, by Plaintiff's failure to avoid, minimize or mitigate such damages.

Respectfully submitted,

/s/ L. Lee Smith

Barbara Sicalides (Lead Counsel)
(Admission pending)
Barak A. Bassman (Admission pending)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: 215-981-4783
Facsimile: 215-981-4750
sicalidb@pepperlaw.com
bassmanb@pepperlaw.com

L. Lee Smith
HINSHAW & CULBERTSON LLP
416 Main Street, 6th Floor
Peoria, IL 61602
Telephone: 309-674-1025
Facsimile: 309-674-9328
lsmith@hinshawlaw.com

Attorneys for Defendant,
OSF HEALTHCARE SYSTEM, an Illinois
not-for-profit corporation d/b/a SAINT
FRANCIS MEDICAL CENTER

80577934v1  0943458

## CERTIFICATE OF SERVICE

I hereby certify that on **March 28, 2013**, I electronically filed this **ANSWER AND AFFIRMATIVE DEFENSES** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Richard T. Greenberg
Angelo M. Russo
Andrew R. Woltman
Susan E. Groh
Kathleen M. Cunniff
MCGUIREWOODS, LLP
77 West Wacker Dr., Suite 4100
Chicago, IL 60601
(*Attorneys for Plaintiff*)


 /s/ L. Lee Smith
Attorneys for Defendant
L. Lee Smith
HINSHAW & CULBERTSON LLP
416 Main Street, 6th Floor
Peoria, IL 61602

80577934v1  0943458