UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| METHODIST HEALTH SERVICES CORPORATION, </br></br> Plaintiff, </br> v. </br> OSF HEALTHCARE SYSTEM, an Illinois not-for-profit corporation b/d/a SAINT FRANCIS MEDICAL CENTER </br></br> Defendant. | Case No. 1:13-cv-01054-SLD-JEH |

## ORDER

In this antitrust case, Plaintiff Methodist Health Services Corporation ("Methodist") complains that Defendant OSF Healthcare System d/b/a Saint Francis Medical Center ("Saint Francis") has reduced competition and raised prices at the expense of consumers for inpatient hospital services and outpatient surgical services in the relevant geographic market by forcing commercial health insurers to enter into provider agreements that effectively exclude Saint Francis' competitor providers from contracting with those insurers. Now before the Court is Saint Francis' Motion for Judgment on the Pleadings, ECF No. 82. For the reasons below, it is DENIED. Defendant's Motion for Leave to File a Reply, ECF No. 89, and Plaintiff's Motion for Leave to File a Surreply, ECF No. 92, are GRANTED.

## BACKGROUND

Methodist's 188-paragraph complaint raises 11 claims against Saint Francis: exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I); attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count II); monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count III); exclusive dealing in violation of the Illinois Antitrust Act, 740 ILCS 10/3 (Count IV); attempted

1

monopolization in violation of the Illinois Antitrust Act, 740 ILCS 10/3 (Count V); monopolization in violation of the Illinois Antitrust Act, 740 ILCS 10/3 (Count VI); tortious interference with prospective economic advantage with respect to BCBS (Count VII); tortious interference with prospective economic advantage with respect to Aetna (Count VIII); tortious interference with prospective economic advantage with respect to Health Alliance (Count IX); tortious interference with prospective economic advantage with respect to Humana (Count X); and unfair and deceptive acts and practices in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/10a (Count XI).

Methodist seeks damages, fees and costs, and for this Court to enjoin Saint Francis from conduct which prevents Methodist from participating in any commercial health insurance network. Compl. 38, ECF No. 1.

I. **The Parties**

The Court accepts as true, as it must when considering a motion for judgment on the pleadings, the following facts alleged in Methodist's complaint. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

Defendant Saint Francis is a not-for-profit hospital located in Peoria, Illinois. *Id.* at ¶ 9. It is the fourth largest medical center in Illinois, *id.* at ¶ 38, and the only provider of certain essential medical services in the relevant geographic area, defined by Methodist as Peoria, Tazewell, and Woodford Counties, Illinois, *id.* at ¶¶ 10, 39.[1] These essential services include solid organ transplants, tertiary pediatric services, Level 3 neonatal intensive care ("NICU"), and

---

[1] Saint Francis does not contest the relevant geographic market.

Level 1 Trauma care. *Id.* at ¶ 39. Saint Francis is part of the OSF Healthcare System. *Id.* at ¶ 37.

Plaintiff Methodist is an integrated health care delivery system consisting of various operating divisions, including an acute care hospital. *Id.* at ¶ 10. It does not offer several of the essential services Saint Francis provides, including organ transplant, tertiary pediatric services, NICU, and Level 1 Trauma care. *Id.* at ¶ 40. Methodist is located in Peoria, Illinois. *Id.* at ¶ 10. In addition to Methodist and Saint Francis, there are four other hospitals in the relevant geographic area: Proctor Hospital, Pekin Memorial Hospital, Hopedale Medical Complex, and Advocate Eureka Hospital. *Id.* at ¶¶ 36, 44–47. None of these hospitals provides either Level 1 or Level 2 Trauma care. *Id.* at ¶¶ 44–47. There also are several non-hospital-based providers in the relevant geographic area that provide outpatient surgical services. *Id.* at ¶ 48.

Because Saint Francis is the largest hospital in the region and the only local provider of certain essential medical services, most health insurance companies doing business in the relevant geographic market consider Saint Francis a "must-have" participating hospital in their health insurance networks. *Id.* at ¶¶ 2, 39.

## II. The Relevant Product Markets and Saint Francis' Market Power

The Complaint defines two relevant product markets: (1) "the sale of inpatient hospital services to commercial health insurers," and (2) "the sale of outpatient surgical services to commercial health insurers." *Id.* at ¶¶ 14, 21.[2] Commercial health insurers include managed-

---

[2] According to the complaint, inpatient hospital services "are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient." *Id.* at ¶ 15. Outpatient hospital services "are a broad group of surgical and related services that generally do not require an overnight stay in a hospital." *Id.* at ¶ 22. Outpatient hospital services "are distinct from procedures routinely performed in a doctor's office." *Id.*

3

care organizations, other HMOs or PPOs, and employer self-funded plans. *Id.* at ¶ 17. Government payers, such as Medicare, Medicaid, and TRICARE, are excluded from the relevant markets. *Id.* at ¶¶ 17–18.

Methodist has excluded government payers from its relevant product market because the price government payers pay for inpatient hospital services and outpatient surgical services does not significantly constrain the prices hospitals and other providers charge commercial health insurers for the same services. *Id.* at ¶ 19. This is because commercial health insurers negotiate their rates with providers individually, while the federal government and each state unilaterally sets the rates and schedules at which it will pay providers for services provided to individuals covered by Medicare and TRICARE and by Medicaid, respectively—rates that typically are lower than the rates negotiated by commercial health insurers. *Id.* Methodist also claims that, because government payers unilaterally set the prices they will pay for services, a hospital or other healthcare provider can impose a price increase for inpatient hospital and/or outpatient surgical services solely on commercial health insurers. *Id.* at ¶¶ 20, 24.

Methodist claims that Saint Francis has approximately 53 percent of the market share for inpatient hospital services sold to commercial health insurers, and more than a 50 percent share of the market for outpatient surgical services sold to commercial health insurers. *Id.* at ¶ 2. Methodist further claims that, on average, OSF's prices are significantly higher than those of the hospitals and other providers with which it competes. *Id.* at ¶¶ 8, 53–54, 57.

### III. Saint Francis' Anticompetitive Conduct and the Resulting Harm

As alleged in the Complaint, Saint Francis has been able to maintain its degree of market power in the relevant markets, despite its significantly higher prices, by leveraging its size and status as a "must-have" hospital to prevent commercial health insurers with whom it has provider

4

agreements from also entering into provider agreements with Methodist or other competitor providers. *Id.* at ¶¶ 3, 81. In particular, Methodist alleges that Saint Francis has threatened the insurers with whom it has provider agreements that, in the event one of those insurers includes a competing provider in its network, Saint Francis will withdraw from that insurer's provider network (taking along with it the essential services that only it can provide) and/or impose substantial pricing penalties on that insurer. *Id.* at ¶¶ 4, 60–61, 68–85.

According to Methodist, Saint Francis has entered into these exclusionary provider agreements with at least BCBS (the largest commercial health insurance company in the relevant geographic area), Humana, Aetna, and Health Alliance. *Id.* at ¶¶ 50, 64, 81, 86–88. Methodist complains that by doing so, Saint Francis has effectively foreclosed Methodist and other competitor providers from over 60 percent of the fully insured commercial health insurance market in the relevant geographic area. *Id.* at ¶ 99. According to Methodist, inclusion in health insurance networks is crucial to hospitals and other healthcare providers because patients nearly always choose in-network healthcare providers for non-emergency care. *Id.* at ¶ 90. Therefore, by foreclosing Methodist and other competitor providers the opportunity to become participating providers in commercial health insurance networks, Saint Francis has reduced the number of privately-insured patients who might otherwise seek inpatient and/or outpatient surgical services from them. *Id.* at ¶¶ 7, 92.

Methodist further complains, and Saint Francis judicially admits,[3] that this foreclosure of access to privately-insured patients threatens its long-term sustainability, as well as that of other

---

[3] Judicial admissions are binding upon the party making them, and have the effect of withdrawing a fact from contention. *Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995) ("A judicial admission is conclusive, unless the court allows it to be withdrawn.").

5

provider hospitals in the relevant geographic area. *Id.* at ¶ 98; Def.'s Ans. ¶ 98, ECF No. 12. Patients covered by commercial health insurance plans pay significantly more than patients covered by Medicare, Medicaid, or TRICARE for inpatient hospital and outpatient surgical services, *id.* at ¶ 93; Def.'s Ans. ¶ 93, and hospitals depend on payments from commercial health insurers to compensate for the comparatively low payments they receive from government payers, *id.* at ¶ 94; Def.'s Ans. ¶ 94.

Methodist believes that Saint Francis has undertaken this conduct with the purpose and intent of monopolizing the markets for inpatient hospital and outpatient surgical services by driving Methodist from the market or at least reducing Methodist's competitive significance within the market. *Id.* at ¶¶ 7–8.

## DISCUSSION

### I. Motion for Judgment on the Pleadings Standard

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings after the pleadings are closed, but early enough not to delay trial. A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Thus, a court should grant a Rule 12(c) motion "only if it appears beyond doubt the plaintiff cannot prove any facts that would support his claim for relief." *Id.* (quoting *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004)); *see also AMCO Ins. Co. v. Swagat Grp., LLC*, No. 07-3330, 2009 WL 331539, at *3 (C.D. Ill. Feb. 10, 2009) ("Judgment on the pleadings is appropriate if undisputed facts appearing in a pleading clearly entitle the moving party to judgment as a matter of law.").

When considering a motion for judgment on the pleadings, a court must take all well-pled allegations as true and draw all reasonable inferences in favor of the non-moving party. *Forseth*,

199 F.3d at 368 (7th Cir. 2000). A court, however, should not assign any weight to unsupported conclusions of law or ignore any facts set forth in the complaint that undermine the plaintiff's claims. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)).

## II. Federal Antitrust Claims (Counts I–III)

In its motion for judgment on the pleadings, Saint Francis argues that it is entitled to judgment on the pleadings because Methodist has failed to plead, and cannot adequately plead, plausible relevant product markets or substantial foreclosure in those markets. Def.'s Mot. J. Pleadings ¶¶ 1–3, ECF No. 82. The Court addresses Saint Francis' argument with respect to the relevant product markets first.

### a. Whether Methodist Has Alleged Implausibly Narrow Relevant Product Markets

Methodist alleges that by entering into and enforcing anticompetitive exclusionary contracts with BCBS, Humana, Aetna, and Health Alliance, Saint Francis unreasonably restrained trade in violation Section 1 of the Sherman Act, Compl. ¶¶ 63, 110–18, and committed the offenses of monopolization and attempt to monopolize in violation of Section 2 of the Sherman Act, *id.* at ¶¶ 119–132. Section 1 of the Sherman Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

Courts have made clear that not all exclusive dealing arrangements are unlawful under Section 1 of the Sherman Act, but only those that restrict competition unreasonably. *See Dos Santos v. Columbus-Cueno-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29 (1961)). Accordingly, whether an exclusive dealing arrangement imposes an unreasonable restraint on competition in violation of Section 1 is analyzed under a rule of reason approach. *Id.*; *see also Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1394 (C.D. Ill. 1987), *aff'd* 844 F.2d 473 (7th Cir. 1988). A plaintiff alleging an exclusive dealing claim can prevail under a rule of reason approach only by establishing that the agreement in question results in a substantial foreclosure of competition in the area of effective competition—that is, in the relevant market. *Dos Santos*, 684 F.2d at 1352 (citing *Tampa Elec. Co.*, 365 U.S. at 327–29); *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 66 (1st Cir. 2004) (finding it is "critical to any attack on [an] exclusive dealing arrangement . . . that plaintiffs establish a relevant market and harm within it"). A relevant market includes both product and geographic dimensions. *Brown Shoe Co v. United States*, 370 U.S. 294, 324 (1962); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 ("Th[e] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.").

Market definition also plays a critical role in Section 2 monopolization and attempted monopolization causes of action. In order to recover on a monopolization claim, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v.*

*Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *see also Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). Similarly, to establish the offense of attempt to monopolize under Section 2 of the Sherman Act, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456; *see also Lekto-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981).

In the present case, Saint Francis argues that Methodist's federal antitrust claims cannot survive judgment on the pleadings because Methodist has pleaded impermissibly narrow relevant product markets. Def.'s Mem. 1–2, 6, ECF No. 82-1. Specifically, Saint Francis argues that Methodist's alleged product markets "improperly and arbitrarily" exclude government payers, which, like commercial health insurers, buy inpatient hospital services and outpatient surgical services from Saint Francis and its competitor providers. *Id.* at 6–7. Saint Francis cites *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009), and *Marion Healthcare LLC v. Southern Illinois Healthcare*, No. 12-CV-00871-DRH-PMF, 2013 WL 4510168 (S.D. Ill. Aug. 26, 2013), in support of its position.

In *Little Rock*, the Eight Circuit Court of Appeals affirmed the lower court's dismissal of Little Rock Cardiology Clinic's ("LRCC") federal antitrust claims pursuant to Rule 12(b)(6) for failing to plausibly define the relevant product market. 591 F.3d at 596–98. After LRCC cardiologists, who had been on staff at Baptist Health hospital and in Blue Cross & Blue Shield

9

of Arkansas' ("BCBSA") preferred provider network, split away from Baptist Health and developed the competing Arkansas Health Hospital, Blue Cross removed LRCC and its doctors from its network. *Id.* at 594. LRCC sued Baptist Health and BCBSA for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and for conspiracy to monopolize, attempted monopolization, and monopolization in violation of Section 2 of the Sherman Act. *Id.* at 595. Similar to the Complaint at issue in this case, LRCC's complaint limited the relevant product market to patients covered by private insurance and excluded patients covered by government insurance. *Id.* at 596. LRCC claimed that its alleged product market properly excluded patients covered by government insurance because patients using private insurance are not reasonably interchangeable with patients using government insurance. *Id.* at 597.

The Eighth Circuit, however, did not agree with LRCC, and rejected the argument that patients covered by private insurance and those covered by government insurance are not reasonably interchangeable in light of LRCC's allegations:

> The trouble with this theory is that it analyzes the issue from the wrong side of the transaction. It may be true that, from the patient's perspective, private insurance and Medicare/Medicaid are not reasonably interchangeable. . . . But this lawsuit is not about the options available to patients, it is about the options available to shut-out cardiologists. . . . The relevant question, then, is to whom might the cardiologists at LRCC potentially provide medical service?

*Id.* at 597. The Eighth Circuit concluded that LRCC "must look to alternative patients who are able to pay the required fees, not just those who pay using private insurance": "Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case." *Id.*

10

The Southern District of Illinois adopted and relied on *Little Rock*'s reasoning in *Marion*—a case presenting issues very similar to those in this case. In *Marion*, the plaintiff, a provider of outpatient surgical services, sued both Southern Illinois Healthcare ("SIH"), a nonprofit corporation that owned both hospitals which provided inpatient and outpatient medical services and several freestanding outpatient service providers, and BlueCross and BlueShield of Illinois ("BCBSI") for violation of federal and state antitrust law and for tortious interference with a business expectancy. 2013 WL 4510168, at *1–2. The plaintiff alleged that SIH and BCBSI substantially suppressed competition for outpatient surgical services in Southern Illinois through exclusionary agreements and other anticompetitive conduct, including exclusive dealing, price discrimination, and monopolization. *Id.* at *1. The complaint defined two relevant product markets: "(1) the sale of general acute-care inpatient hospital services, including pediatric services and neonatal care services to commercial health insurers, and (2) the sale of outpatient surgical services to commercial health insurers." *Id.* at *2 (internal quotation marks omitted).

The *Marion* defendants moved to dismiss the complaint on a number of grounds, including that the plaintiff had failed to plead, and could not adequately plead, a plausible relevant product market. *Id.* at *4–5, 9. BCBSI, like Defendants here, asserted that the alleged relevant product markets were deficient as a matter of law because they excluded government payers to whom the plaintiff could and did sell its services. *Id.* at *9. The plaintiff opposed dismissal of its claims on such product market grounds, arguing that government payers are not interchangeable with commercial health insurers because government payers pay providers significantly lower prices than do commercial health insurers. *Id.*

But the Southern District of Illinois, like the Eighth Circuit in *Little Rock*, disagreed with the plaintiff's interchangeability argument, and found that the relevant product markets, as

11

defined in the complaint, were not plausible because they failed to include all potential buyers of inpatient or outpatient services: "Although plaintiff has alleged that government payers pay less than commercial insurers, and that the government reimbursement amounts are not negotiable, plaintiff has not adequately alleged that Medicare or Medicaid patients are not significant sources of input to it as a supplier of outpatient services." *Id.* at *10–11.

In opposing Saint Francis' motion for judgment on the pleadings, Methodist argues that *Little Rock* and *Marion* are at odds with the relevant market inquiry set out by the Supreme Court in *Brown Shoe*, or at least distinguishable on the pleadings from the instant case. Pl.'s Resp. 3–5, 11, ECF No. 84. In *Brown Shoe*, the Supreme Court established that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325. The Supreme Court, citing its decision in *E.I. du Pont de Nemours & Co.*, 353 U.S. at 593–95, also established that within a product market, "well-defined submarkets may exist, which, in themselves, constitute product markets for antitrust purposes." *Id.* A court may determine the boundaries of such a submarket by examining "such practical indicia" as (i) industry or public recognition of the submarket as a separate economic entity, (ii) the product's peculiar characteristics and uses, (iii) unique production facilities, (iv) distinct customers, (v) distinct prices, (vi) sensitivity to price changes, and (vii) specialized vendors. *Id.* The same principles that are used to define a relevant market for products also are used to define a relevant market for services. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 n.11 (7th Cir. 1979).

Where a plaintiff seller complains that a competitor's exclusionary conduct foreclosed it selling opportunities, courts typically find, as *Little Rock* and *Marion* held and Saint Francis argues, that all buyers to whom the competitor's rivals might sell their services are reasonably

12

interchangeable under the test set out in *Brown Shoe*. *See, e.g.*, *Stop & Shop Supermarket Co.*, 373 F.3d at 67 (noting "the concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*"—in that case, "presumptively *all* retail customers for prescription drugs—not just that smaller sub-group who are insured or reimbursed"); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."); *see also* 2B Philip E. Areeda et al., Antitrust Law ¶ 570e, at 418 (3d ed. 2007) ("The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals, namely all of the product and geographic sales they may readily compete for . . . .").

But courts also recognize that "there might be some special circumstance that ma[kes] separate consideration of [a] sub-group [of buyers] appropriate." *Stop & Shop Supermarket Co.*, 373 F.3d at 67. For example, where the loss of high-profit sales unusually impairs the foreclosed rivals' survivability, *see* Areeda, Antitrust Law ¶ 570e, at 424, or where there is an inelastic difference in price between sales of a single product to a particular group of customers and sales of that same product to other customers, *see United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990) (noting, in dicta, that "diet soft drinks sold to diabetics are not a relevant product market, but that is because the manufacturers cannot separate their diabetic customers from their other customers and charge the former a higher price"); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) (finding that a large price differential as a result of a government price support raising the price of one product, but not a second product, to an artificially high level supported placing products in separate relevant

product markets, despite that the products were otherwise similar in use and quality, "because of the inability of the price supported product to constrain the price of the other product").

Here, Methodist has alleged, and Saint Francis has admitted, that access to privately-insured patients is critical to a healthcare provider's long-term sustainability in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services, Pl.'s Resp. 4 (citing Compl. ¶¶ 93–94, 98; Def.'s Ans. ¶¶ 93–94, 98)—prices that, in certain cases, may be below cost, Comment to Proposed Consent Judgment at 3, *United States v. United Reg'l Heathcare Sys.*, No. 7:11-cv-00030-0 (N.D. Tex. June 6, 2011), ECF No. 8-1.[4] Methodist also has alleged that government reimbursement rates do not significantly constrain healthcare providers' pricing to commercial health insurers, *id.* at ¶ 19, and that providers can target a price increase for inpatient hospital and/or outpatient surgical services solely at commercial health insurers, *id.* at ¶¶ 20, 24.

In light of such allegations and admissions, the Court cannot find, as a matter of law, that the sales of inpatient hospital and outpatient surgical services to commercial health insurers are interchangeable with the sales of these same services to government payers. Dismissal of Methodist's federal antitrust claims for failing to plead plausible relevant product markets therefore is inconsistent with the standard of review the Court must apply when considering a motion for judgment on the pleadings under Rule 12(c).

Having found that Methodist's defined product markets are plausible based on the pleadings, the Court turns to Saint Francis' foreclosure argument.

---

[4] While the consent judgment in *United Regional Healthcare System* is neither authoritative nor controlling, *see Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 312 (7th Cir. 1976), the Court takes notice of the public comment submitted by the American Medical Association in that case as an example of evidence Methodist expects to be able to prove through fact and expert discovery, *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

### b. Whether Methodist Has Failed to Plead Foreclosure

Saint Francis argues that judgment on the pleadings with respect to Methodist's federal antitrust claims is warranted because Methodist has failed to plead that Saint Francis' exclusive dealing has resulted in substantial foreclosure of competition in the relevant market, namely that Methodist only alleges foreclosure of a subset of patients covered by commercial health insurance plans (those covered by fully insured commercial plans). Def.'s Mem. 10–12; Def.'s Reply 3–4, ECF No. 89-1.

Saint Francis is correct that Methodist has alleged that Saint Francis' exclusionary conduct has foreclosed Methodist and other competitor providers from 60 percent of the fully insured commercial health market. *See, e.g.*, Compl. ¶¶ 114–115, 137–138. But its argument goes too far at this stage of the litigation. In particular, the argument ignores that, elsewhere in the Complaint, Methodist has pleaded factual allegations from which this Court can reasonably infer that, with the benefit of discovery, Methodist will be able to establish the extent to which it is foreclosed from the self-funded portion of the commercial health insurance market. *See Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987) (cautioning that motion for judgment on the pleadings may be granted only if, *inter alia*, the moving party clearly establishes that no material issue of fact remains to be resolved).

Moreover, Saint Francis has pointed to no authority, binding or otherwise, to suggest that dismissal of a plaintiff's antitrust claims for failing to allege an exact percentage foreclosure in its pleadings is appropriate under either Rule 12(b)(6) or Rule 12(c), nor has the Court's own research uncovered a Seventh Circuit case saying as much. *Cf. In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013)

("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.").

The Court therefore finds that Methodist's allegations of substantial foreclosure are sufficient to survive Saint Francis' motion for judgment on the pleadings. Saint Francis' motion is DENIED with respect to Counts I–III.

### III. State Law Claims (Counts IV–XI)

In addition to its federal antitrust claims, Methodist asserts state law claims for exclusive dealing, attempted monopolization, and monopolization under the Illinois Antitrust Act, 740 ILCS 10/3 (Counts IV–VI); for tortious interference with prospective economic advantage (Counts VII–X); and for unfair and deceptive acts and practices under the Illinois Consumer Fraud Act, 815 ILCS 505/10a (Count XI). Saint Francis argues that Methodist cannot sustain these state causes of action absent the continuation of its antitrust causes of action, without asserting any independent bases for their dismissal. Def.'s Mem. 12. Therefore, because this Court has denied Saint Francis' motion with respect to Methodist's federal antitrust claims, the Court must also DENY Saint Francis' motion for judgment on the pleadings with respect to Methodist's state law claims.

## CONCLUSION

For the above reasons, Saint Francis' Motion for Judgment on the Pleadings, ECF No. 82, is DENIED. Saint Francis' Motion for Leave to File a Reply, ECF No. 89, and Methodist's Motion in the Alternative for Leave to File Surreply, ECF No. 92, are both GRANTED. The Clerk is directed to file Defendant's Reply, ECF No. 89-1, and Plaintiff's Surreply, ECF No. 92-1.

Entered this 25th day of March, 2015.

s/ Sara Darrow  
SARA DARROW  
UNITED STATES DISTRICT JUDGE