E-FILED
Friday, 30 September, 2016  01:26:48 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| METHODIST HEALTH SERVICES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:13-cv-01054-SLD-JEH |
| v. | ) ) | |
| OSF HEALTHCARE SYSTEM, an Illinois not-for-profit corporation d/b/a SAINT FRANCIS MEDICAL CENTER, | ) ) ) ) | |
| Defendant. | ) ) | |

ORDER

Two hospitals dominate the market for inpatient medical services in Peoria, Illinois.  One, St. Francis, is about twice as big as the other, Methodist.[1]  St. Francis offers many high-end services that neither Methodist nor any other hospital in Peoria offer, such as sophisticated pediatric care and solid organ transplants.  Methodist sued St. Francis because St. Francis has entered into contracts with some commercial health insurance companies that require those insurers to exclude Methodist from the insurers' provider networks.  St. Francis' exclusive contracts violate federal antitrust law, Methodist has alleged, because they unreasonably restrain trade by substantially foreclosing Methodist's ability to compete for commercially insured patients' business, which is far more profitable for a hospital than business from publicly insured patients.  St. Francis has moved for summary judgment on all claims.  The motion is GRANTED.[2]

---

[1] The parties in this case are the parent companies that own the hospitals.  *See* Dkt.  To simplify, the Court refers to the hospitals and their corporate management interchangeably, unless there is a relevant distinction, in which case the Court will note it.

[2] The parties have also filed motions to file their briefing under seal.  ECF Nos. 151, 164, 165, 174.  Those motions are granted except to the extent the Court relies on factual background in resolving the motion for summary

BACKGROUND

1.      **Facts**

a.      **General overview of healthcare delivery and payment**

This is an antitrust case about the provision of healthcare by and payment to various hospitals in Peoria.  Some background on the way health insurance works, broadly speaking, is necessary to understand the legal claims asserted and this motion's resolution.  The hospitals are called providers and the entities that pay for the healthcare, usually either private or public insurers, are called payers.

At the most general level, providers recoup their costs in one of three ways—they bill the government if the patient is covered by public insurance (Medicare or Medicaid, for example); they bill an insurance company if the patient is covered by private insurance; or they bill the patient directly if he is not insured.  More people are covered by government health insurance than by commercial health insurance, and uninsured people make up a very small slice of the overall market.[3]

The evidence in the record suggests that patients covered by government insurance are not profitable for hospitals; several executives testified that payment for services provided to those patients do not cover the hospitals' costs.  The ratio of patients covered by government insurance to patients covered by commercial insurance is called a payer mix.  Providers strongly prefer a payer mix that includes a higher proportion of commercially insured patients.

---

judgment. *See infra* Section II for further discussion. Further, Methodist has filed a motion to clarify the record following St. Francis' reply.  ECF No. 172.  The Court has reviewed that motion and it is GRANTED, although the Court has focused its analysis on the parties' summary judgment briefing.

[3] In 2013, 30 percent of St. Francis' discharges were covered by commercial insurance as opposed to 62 percent by government insurance.  In that year, 28 percent of Methodist's discharges were commercially insured and 66 percent were governmentally insured.  Also in 2013, St. Francis' received 47 percent of its payments from private payers and 52 percent from public payers.  Methodist's numbers were 40 percent and 60 percent.

Commercial insurance companies, typically large national firms, sell managed care plans to employers or individual consumers.  Those plans can take several forms, but in this case the only two kinds that matter are called preferred provider organizations ("PPO") and health maintenance organizations ("HMO").  The major differences are that HMOs are usually cheaper but more restrictive to the end user.  PPOs can be further classified into two broad groups:  self-insured and fully funded.  In a fully funded insurance plan, the payer (the commercial insurer) administers the plan and also bears the cost of the healthcare provided to the insureds.  In a self-insured plan, also called an administrative services only plan ("ASO"), an employer, usually a large one, contracts with the payer to deal with the providers but bears the cost of healthcare provided to the plan's members.

The content of a health insurance plan is dictated by contracts made between providers and payers.  Those parties dicker over terms such as duration and price of services.  Another important term addresses the provider network.  From a patient's point of view, a provider network lists the providers they can visit and receive lower prices for medical services, as compared to prices charged by out-of-network providers.  The fight in this case arises out of terms dealing with network exclusivity.  Network exclusivity in a health insurance plan refers to the network's breadth.  A plan has a broad, or open, network if a patient can visit many different providers and still receive a favorable rate.  A plan has a narrow network if a patient may receive favorable rates at only one or few providers.  The use of networks creates obvious incentives for commercial insurers to funnel their insureds (via other incentives, like deductibles and co-pays) toward in-network providers.

A simple exclusivity clause might look like this:  in return for a lower rate on services at hospital X, payer Y may not include hospital Z in its plans' networks.  Providers generally offer

3

payers lower rates in return for network exclusivity.  Conversely, if a payer wants to offer a broader network to its customers (that is, employers or individual purchasers of health insurance), it typically must agree to pay higher rates to providers.  The parties and literature refer to the pricing difference between broad and narrow networks as an open-network premium.  Providers want narrow networks because even though the prices they charge to commercially insured patients will be relatively lower, the incentives created by the network pricing structure will increase commercially insured patient volume.  Payers usually seek broader networks, as long as the prices are not too high, because their customers value flexibility when making decisions regarding healthcare.

In this case, the evidence tends to show that St. Francis strongly favors exclusivity when bargaining with payers.  Exclusivity has many benefits to a provider, and the evidence suggests St. Francis thought that predictability of commercial inpatient volume was very important given several of its long term capital investments.  In particular, it does not want payers to include Methodist in any network that also includes St. Francis, other things being equal.  Methodist also has several exclusive contracts, but they are all many times smaller than St. Francis' largest exclusive contract.  Both hospitals' networks will be discussed in greater detail below.

### b.      The healthcare market in Peoria

There are six hospitals in the geographic area relevant to this case.[4]  St. Francis is the biggest, it has 616 beds.  Methodist is the second largest, it has 330 beds.  Proctor hospital is third largest with 220 beds.[5]  There are three other hospitals in the area:  Pekin (107 beds);

---

[4] All agree that the relevant geographic area in this case includes the counties of Peoria, Tazewell, and Woodford. The parties refer to this region as the "tri-county area."

[5] Methodist and Proctor are now both owned by UnityPoint Health.

Eureka (25 beds); and Hopedale (25 beds).  Methodist and St. Francis are located very close to one another—they are separated by less than a quarter mile.

In addition to being the largest, St. Francis is by far the most advanced hospital in the area.  It is the only Peoria hospital that can perform solid organ transplants; it is the only Peoria hospital that has the highest level of trauma care; it is the only Peoria hospital with a neonatal intensive care unit; and its pediatric unit is far more extensive and advanced than the other hospitals'.  That pediatric unit includes the Children's Hospital of Illinois, and it amounts to 136 of St. Francis' beds.  St. Francis is also a teaching hospital (generally a boon for physician recruitment).  According to Methodist's expert's report, "18.3% of [St. Francis'] commercial inpatient days are attributable to inpatient services for which" St. Francis is the exclusive or near-exclusive provider.  *See* Capps Report ¶¶ 105–108, MSJ Ex. 74, ECF No. 146-14.  Beyond those services for which St. Francis is the exclusive provider in the geographic region St. Francis and Methodist are relatively fungible, although some of the evidence suggests Methodist has higher quality of care metrics than St. Francis.  The evidence also shows that, other things equal, people prefer to get medical care locally; if a cardiac patient from Peoria can undergo the same procedure in Peoria as in Chicago, she will likely get it done in Peoria.

Many of the familiar major national health insurance companies offer products in the Peoria market.  They include Blue Cross Blue Shield; Humana; Coventry; Aetna; and some others.  Peoria's commercial health care market has a quirk—the second largest source of commercially insured patients is Caterpillar, the area's largest employer, rather than from a health insurer.  Caterpillar employees primarily use an ASO PPO.

        **c.**        **St. Francis' exclusive contracts**

This litigation arises out of several contracts that have exclusivity provisions that favor St. Francis.  The first three are between St. Francis and different commercial insurers and the last dealt with the health care for Caterpillar employees.

### 1.      Blue Cross Blue Shield

Blue Cross Blue Shield ("BCBS") is the largest and most important commercial insurer in the market.  It offers two products relevant to this case:  a PPO and an HMO.  The PPO has been exclusive to St. Francis since 2002.  The HMO is exclusive to Methodist.[6]

The BCBS PPO is roughly twenty times larger than the BCBS HMO.  Capps Report ¶ 118.  The BCBS PPO accounted for 32 percent of all admissions and 34 percent of all payments at St. Francis and Methodist, combined, in 2012.  Capps Report 54 Fig. 17.[7]  The BCBS PPO is by far the largest commercial plan in the market.  The same figures for the BCBS HMO are 1.6 and 2.1 percent.  St. Francis derives 39 percent of its commercial inpatient revenue from the BCBS PPO.

A contract from 1982 between Methodist and BCBS governs the out-of-network pricing for BCBS PPO plan members who are treated at Methodist; when Methodist treats BCBS PPO plan members, it is reimbursed by BCBS under the terms of the 1982 contract.  Methodist has since 2006 operated a matching program, pursuant to which it waives all charges to out-of-network commercially insured patients above what those patients would pay if they received the same services at St. Francis.  *See* Capps Report ¶ 545.  The effect of the matching program is that care received out of network at Methodist is not more expensive to BCBS PPO insureds than care received in network at St. Francis—in theory it removes the patient's incentive to visit St.

---

[6] St. Francis has recently been added to the BCBS HMO network, but was not for much of the time relevant to this case.

[7] While Capps' report only accounts for admissions at St. Francis and Methodist, the Court treats the figures as an adequate proxy for the entire geographic market.

Francis at the expense of Methodist.  Methodist actively marketed its matching program.
Methodist's revenues from BCBS PPO patients grew steadily (between 5 and 10 percent per
year) since the program's implementation, and in 2010 resulted in $40 million in revenue.  To
put that figure into perspective, Methodist's total operating revenue for 2013 was $380 million.

###### 2.      Humana

Humana is the second largest commercial insurer in the area—it accounted for 13 percent
of commercial admissions and 10 percent of commercial payments in 2012.  Humana's network
does not include Methodist.

Humana became a major player in the Peoria market when it acquired what used to be
OSF's commercial health insurance business.  OSF (St. Francis' parent) conditioned the
transaction on Humana keeping St. Francis as the exclusive in-network provider.  A shade under
20 percent of the Humana covered lives, about 20,000 at the time of the 2008 acquisition, are
OSF employees (OSF is the second largest Peoria area employer).  In return for exclusivity,
Humana receives favorable rates—it is the beneficiary of what in the industry is known as "most
favored nation" status (MFN).

###### 3.      Health Alliance

Health Alliance Medical Plans ("HAMP") accounts for 5 percent of commercial inpatient
admissions and 6 percent of commercial payments in the market.  The relevant HAMP plan is an
HMO.  HAMP used to be affiliated with a standalone regional clinic called the Carle Clinic
Association.  In 2009, OSF purchased one of the Carle Clinic locations (in Bloomington,
Illinois), and in connection with that transaction HAMP agreed to an exclusive provider
agreement with St. Francis.  Before the acquisition, OSF was not an in-network provider for
HAMP, but Methodist was.

HAMP and Carle Clinic have a strong link—"30 or 40" percent of the clinic's patients were insured by HAMP. The overwhelming majority of HAMP patients had Carle physicians as their primary care physician, with the remainder assigned to Methodist physicians. Once OSF bought the clinic, a conflict emerged from St. Francis' point of view: most of the doctors at the clinic were aligned with an insurer that dealt with Methodist. Further, OSF brought the Carle doctors into its physician group in fall of 2009.

Methodist contends that HAMP signed an exclusive contract with St. Francis under coercion from St. Francis. St. Francis argues that the reason HAMP switched providers is that Methodist failed to accept a risk sharing clause as part of a renewed contract, but that St. Francis did, in fact, agree to the risk-sharing aspect of the contract. The evidence is disputed on the point, that is, a jury could conclude HAMP entered the exclusive contract under pressure from St. Francis or due to Methodist's failure to accept a share of HAMP's risk.

### 4.    Other St. Francis exclusive payers

The lone remaining exclusive payer in this case is Aetna. Aetna only amounts to a little over 1 percent of the market.

### d.    Caterpillar[8]

Caterpillar's health plans have changed significantly over the past several years, though they have been mostly self-insured for all the years relevant to this litigation. Up until 2010, Caterpillar offered its employees a self-insured PPO administered by United. The PPO was a St. Francis exclusive network, and had been since at least 2001 pursuant to a long term contract. In

---

[8] St. Francis contends that evidence related to foreclosure of Caterpillar employees may not be considered because, essentially, no Caterpillar "claim" was pled. As the Court reads the complaint, the antitrust claims in this case arise out of St. Francis' allegedly unlawful conduct, and its dealing with Caterpillar is evidence of that conduct, not a separate claim that must have been pled. In any event, the course and scope of discovery should have alerted St. Francis to the fact that St. Francis had previously formed exclusive contracts with Caterpillar, and therefore it cannot claim to be surprised that those contracts are at issue in this case. *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 632 (7th Cir. 2010).

2009, Caterpillar also began to offer its employees a fully-insured HMO from HAMP.  The HMO was a Methodist exclusive.  The PPO was far more popular with Caterpillar workers.

In 2010, Caterpillar decided to move away from exclusive networks.  Following what the evidence suggests were protracted negotiations, Caterpillar decoupled the services that only St. Francis could provide with those that overlapped with Methodist's capabilities, and opened its PPO network up to include both hospitals.  In 2011, the Caterpillar HMO network opened up to include both hospitals as well.  For the years 2005 through 2009, for every one Caterpillar insured admitted to Methodist, 44 were admitted to St. Francis.  Following the opening of the network, that is, for the years 2010 through 2013, for every Caterpillar inpatient admitted to Methodist there were 5.4 admitted to St. Francis.  (For example, in 2012 there were 1,737 Caterpillar patients at St. Francis and 351 Caterpillar patients at Methodist.  In 2008 the numbers were 2,986 and 79.)

Caterpillar paid to open the networks.  That is, it lost the discount it enjoyed when St. Francis was the exclusive provider for the PPO.  There was a 38 percent price increase of St. Francis' unique-to-Peoria services (the so-called tertiary services), and a general 3.7 percent price increase for non-tertiary inpatient services.[9]

### e.    Market foreclosure

Methodist hired an economist named Cory Capps to write a report showing that St. Francis' exclusive contracts have substantially foreclosed Methodist from competing in the

---

[9] There is some dispute between the parties about whether the 38 percent tertiary services price increase combined with the general smaller price increase actually shows an open network premium.  All the evidence in the record shows that such a premium exists, generally.  It is therefore Methodist's burden to show that prices went down when the network opened up to competition.  The parties have not clearly shown, either way, whether the two-tiered pricing increase represents an overall increase or decrease to Caterpillar.  (The evidence Methodist relies on shows a Caterpillar employee's forecast for a change in "total spend" from between an increase in four percent and a decrease in two percent.  It is not clear why Methodist has not provided a comparison between OSF exclusive Caterpillar spending and open-network Caterpillar spending.)  *See* Resp. Ex. 156, ECF No. 159-11.

market for commercially insured patients in and around Peoria.  Among other things, Capps'

report offers a quantification of the total percentage foreclosure for two years, 2009 and 2012.

In 2009, according to Capps, 54 percent of the market was foreclosed by three

commercial plans that excluded Methodist from their provider network:  the BCBS PPO; the

Caterpillar PPO; and the Humana plan (formerly OSF's plan).  And in 2012, Capps' figure was

similar:  52 percent, based on the exclusivity found in the BCBS PPO; the Humana plan; the

HAMP plan; and the very small Aetna plan (Caterpillar had by then opened its network).

## 2.    Methodist's legal claims

Methodist filed a nine-count complaint against St. Francis that alleges three federal

antitrust claims and six claims arising under Illinois law.  The antitrust claims assert violations of

both sections of the Sherman Act.  They contend that St. Francis' exclusive dealing has

unreasonably restrained trade; that St. Francis has unlawfully maintained monopoly power; and

that St. Francis has sought monopoly power through unlawful means.

The basis of Methodist's claims is St. Francis' exclusive contracts.  Methodist alleged

that St. Francis wielded market power because it is the only area hospital that provides certain

essential services and was therefore what is known in the healthcare industry as a must-have

hospital.  It used that market power, according to Methodist, to coerce commercial payers into

excluding Methodist from their provider networks and to pay greater than competitive rates by

threatening to withdraw from the payers networks, thus making the payers' products less

competitive in their marketplace.  *See* Compl. ¶¶ 58–63, ECF No. 1.

## 3.    St. Francis' motion for summary judgment and Methodist's response

St. Francis has filed a motion for summary judgment on all claims.  As to the federal

antitrust claims, St. Francis contends that its exclusive contracts with commercial payers do not

substantially foreclose Methodist from competing for commercial patients and because, as explained in greater detail below, substantial foreclosure of competition in the market is one of the major legal issues in this case, the antitrust claims fail as a matter of law.  St. Francis concedes that it exercises market power for purposes of its summary judgment motion, and makes several related arguments that directly address Methodist's Sherman Act claims.

First, it contends Methodist was not substantially foreclosed from the market for commercially insured patients in Peoria because, in essence, the market was functioning properly.  In support of this first argument, St. Francis (1) highlights Methodist's "alternative distribution channels," including the commercial health plans for which Methodist was in network; and (2) points out that many Peoria employers offer their employees a choice between a St. Francis exclusive plan and a Methodist exclusive plan, meaning the exclusive contracts do not prevent employees from choosing Methodist.  Next, St. Francis highlights Methodist's match program.  If a BCBS PPO member had a choice between the two hospitals and price was not a factor, then the exclusive contract could not have unfairly foreclosed competition, according to St. Francis.[10]  Finally, St. Francis makes what is in essence an embedded *Daubert* motion; it goes through Capps' report line by line and identifies purported errors in his calculation of the rate of foreclosure.  The assault on Capps' arithmetic is made up of five distinct points, which the Court will address in turn below.  As a throwaway argument (subheading "6"), St. Francis claims no foreclosure exists because Methodist has been able to compete for all the relevant exclusive contracts.

St. Francis' foreclosure arguments, therefore, are distinct but related—first it contends that Methodist is able to compete at some level for every commercially insured patient in the

---

[10] The match program applied to the Blue Cross Blue Shield PPO—by far the largest and most important source of commercial payments in the market.

market, but even if it is not able to compete, Capps' foreclosure calculation falls far below the threshold established by case law to make out substantial foreclosure. The summary judgment motion then focuses on the outpatient market claim. St. Francis states that there is an "obvious failure of proof" because Capps did not perform a separate analysis for the outpatient market; instead he assumed the market dynamics were identical as those for the inpatient market.

Separate from its arguments related to substantial foreclosure, St. Francis asserts that Methodist cannot prove an antitrust injury. Antitrust injury is injury to competition, like higher prices or poorer quality, injury to a competitor does not satisfy the requirement. Because antitrust injury is an essential component of a Sherman Act claim, summary judgment is appropriate. Finally, St. Francis argues that the product market in this case (a threshold inquiry in any antitrust case) should encompass both commercial and government patients. If the evidence supports such a broad product market, as opposed to one that includes only commercial payments, then the claims fail.

Methodist disagrees. First, Methodist addresses the arguments related to substantial foreclosure. It asserts that it was not, in fact, able to compete for the BCBS PPO contract because of St. Francis' exercise of market power. It argues that the alternative distribution channels identified by St. Francis are not, in fact, adequate. And it finally responds to the attack on Capps' report. Methodist also points to several facts that it contends are sufficient to prove antitrust injury, and concludes by arguing that St. Francis' conception of the relevant product market is too narrow.

ANALYSIS

## I. Plaintiff's Antitrust Claims

### 1.      Legal standards

### a.      Rule 56

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).

### b.      The Sherman Act

Section 1 of the Sherman Act "prohibits '[e]very contract . . . in restraint of trade or commerce.'"  *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (quoting 15 U.S.C. § 1).  Courts have interpreted the statute, however, to bar only those agreements that unreasonably restrain trade.  *Id.* (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  A § 1 claim comprises three elements:  "(1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that [the plaintiff was] injured."  *Id.*

The Sherman Act's second section proscribes monopolization and attempted monopolization.  *See* 15 U.S.C. § 2.  Section 2 does not make monopolies, or even monopolistic pricing, illegal.  *E.g.*, *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) ("To have a monopoly and to monopolize are two separate things.").  Instead, it forbids the exercise or pursuit of monopoly power through improper means.  *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (citing *Am. Academic Suppliers, Inc.*, 922 F.2d at 1320, and *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d

1469, 1481 (7th Cir. 1991)).  Exclusive dealing may amount to improper means of maintaining or pursuing a monopoly.  *See United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) and *United States v. Aluminum Co. of Am.*, 148 F.2d 116 (2d Cir. 1945)).

To prevail on a § 2 monopolization claim, a plaintiff must show "(1) that the [defendant] possessed monopoly power in that market; and (2) that the [defendant] willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident."  *Mercatus Group*, 641 F.3d at 854 (citing *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir. 1980)).  The elements of an attempted monopolization claim are:  "(1) the [defendant's] specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed."  *Id.* (citing *Lektro-Vend Corp v. The Vendo Co.*, 660 F.2d 255, 270 (7th Cir. 1981)).

Exclusive dealing claims under § 1 are analyzed under the so-called rule of reason. *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) ("[Exclusive dealing] agreements, whether challenged under section 3 of the Clayton Act or section 1 of the Sherman Act, will be judged . . . under the Rule of Reason, and thus condemned only if found to restrain trade unreasonably." (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333–35 (1961))).  Whether exclusive dealing unreasonably restrains trade depends on whether the contracts result in substantial foreclosure of competition, that is, whether its "probable effect is to substantially lessen competition in the relevant market."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012) (citing *Tampa Elec.*, 365 U.S. at 327–29); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing

is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are

frozen out of a market by the exclusive deal.").

The substantial foreclosure analysis typically has a quantitative and a qualitative

dimension. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68

(1st Cir. 2004) ("[L]ow numbers make dismissal easy, high numbers do not automatically

condemn, but only encourage closer scrutiny . . . ."); *see also United States v. Microsoft*, 253

F.3d 34, 69–70 (D.C. Cir. 2001) (labeling threshold quantitative requirement as "prudential").

Courts typically require a plaintiff to make an initial showing of foreclosure from competing in

at least 30 to 40 percent of a market to proceed with a claim. *E.g.*, Stop & Shop, 373 F.3d at 68

("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than

30 or 40 percent.").  In addition to the share of the market foreclosed by any exclusive contracts,

courts consider factors like the duration of the contracts (longer duration tends to foreclose

competition more) and whether a firm can reach the market through alternative channels of

distribution (existence of alternative means of distribution lessens any anticompetitive effect).

*See, e.g.*, *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997); *CDC*

*Techs., Inc. v. IDEXX Labs., Inc.*, 7 F. Supp. 2d 119, 121 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d

Cir. 1999).

Exclusive dealing claims brought under § 2 are analyzed in much the same way as § 1

claims—that is, an exclusive contract is illegal only if it substantially forecloses competition in

the relevant market.[11]  *See United States v. Dentsply Intern., Inc.*, 399 F.3d 181, 191 (3d Cir.

2005) ("Under [§ 2], it is not necessary that all competition be removed from the market. The

test is . . . whether the challenged practices bar a substantial number of rivals or severely restrict

---

[11] Of course, as noted above, section 2 claims also require a plaintiff to prove that the defendant possesses monopoly power or substantial market power.  St. Francis has conceded for purposes of this motion that it possesses market power.

the market's ambit.").  Although both § 1 and § 2 require a plaintiff to prove substantial foreclosure, the threshold quantitative showing may be lower for a § 2 claim.  *Microsoft*, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").  In a § 2 monopolization claim, the focus shifts away from the raw total foreclosure and onto the impact of the exclusive contracts on the defendant's ability to maintain or grow its market share.  *See Dentsply*, 399 F.3d at 187.

It is true that some exclusive contracts may be predatory in the sense that a firm with market power uses its competitive advantage unfairly to prevent rivals from entering or competing in a market.  Yet many promote, rather than foreclose, competition.  On one side of the line are those contracts described by the Seventh Circuit in *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996).  There, the court wrote: "[c]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."  *Id.* (hypothesizing a year-long contract to exclusively supply an automobile manufacturer with tires).  On the other side of the line are the kinds of exclusive contracts featured in cases like *Dentsply*, where a monopolist defendant, as a matter of formal corporate policy, deploys exclusive contracts to limit completely their competitors' ability to access the market.

## 2.    Discussion

### a.    The relevant market

A threshold, and often dispositive, issue in any antitrust case requires the plaintiff to prove a market in which trade is allegedly restrained.  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) ("Without a well-defined relevant market, a

court cannot determine the effect that an allegedly illegal act has on competition."); *see also*

*Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1329 (7th Cir. 1981).  The relevant

market has both a geographic dimension and a product dimension.  *Brown Shoe Co. v. United

States*, 370 U.S. 294, 324 (1962); *Little Rock*, 591 F.3d at 596.  To determine the relevant

product market, federal courts focus on whether two products are reasonable substitutes for one

another—if they are then they should be included in the same market for the purpose of antitrust

analysis.  *Brown Shoe*, 370 U.S. at 325; *see also United States v. Rockford Mem'l Corp.*, 898

F.2d 1278, 1283 (7th Cir. 1990).

     In a run-of-the-mill antitrust action, a product market is based on the cross-elasticity[12] of

demand from the point of view of the consumer.  *See Kaiser Aluminum*, 652 F.2d at 1330

("Perhaps the clearest indication that products should be included in the same market is if they

are actually used by consumers in a readily interchangeable manner.").  In a case like this,

however, the analysis turns on the substitutability of a buyer from the perspective of the seller;

that is, are commercially insured patients reasonably interchangeable with government patients

from the providers' point of view.  *See Little Rock*, 591 F.3d at 596–97; *see also Stop & Shop*,

373 F.3d at 67 (stating in an analysis of the product market:  "the concern in an ordinary

exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*").

     St. Francis contends the product market in this case should include both commercial and

government payers.  Methodist protests that the evidence shows the two are not interchangeable

from the perspective of a hospital.  The Court agrees with Methodist for two reasons.

     First, St. Francis admitted in its answer that government payers pay significantly less than

commercial payers and that "patients covered by government plans are not adequate substitutes

---

[12] The concept measures the increase in demand for a substitute good Y if the price of X is increased by some marginal amount.  *See Brown Shoe*, 370 U.S. at 325.

for commercially insured patients."  Answer ¶¶ 93–94, ECF No. 12.  Second, the evidence cited

by Methodist tends to show that payments from government insurers do not cover the providers'

costs.  A jury could conclude that no provider would consider a government payer's insured a

reasonable substitute for a commercial payer's insured.  Thus the market in this case is correctly

defined as commercial payers.

To the extent St. Francis relies on the *Little Rock* case, it is easily distinguished.  That

case arose on a motion to dismiss, and the opinion nowhere mentions allegations that

government payers reimburse at substantially different rates than commercial payers.  In fact, the

Eighth Circuit explicitly treated the two sources of revenue as fungible.  *See* 591 F.3d at 597

("Patients able to pay their medical bill, regardless of the method of payment, are reasonably

interchangeable from the cardiologist's perspective—the correct perspective from which to

analyze the issue in this case.").  Here, the record suggests that the medical bills charged to

commercial payers and public payers are markedly different.  Accordingly, the product market

excludes government insurers.[13]

### b.    Substantial foreclosure

The contrast between *Paddock Publications* and *Dentsply*, and what it means generally to

be unlawfully foreclosed from competition, is central to this case.  The parties implicitly disagree

over the meaning of foreclosure from competition.  Methodist seems to argue that if a contract

excludes Methodist from a provider network then it has been foreclosed from competing for all

the patients covered by that plan, full stop.  The undisputed facts of this case suggest that

analysis is not correct.  Here, there are several layers of competition:  the hospitals compete with

each other for payer contracts; payers compete vigorously with other payers to sell their health

insurance plans to their customers (usually and most importantly employers), and at the retail

---

[13] The parties agree that the relevant geographic market comprises the 6 hospitals in the tri-county area.

level hospitals compete against each other to attract individual patients, often through aggressive marketing. Market dynamics at each level impact the ultimate inquiry of whether a provider is foreclosed from competing for a commercially insured patient's business. Accordingly, whether Methodist was foreclosed from competition must be analyzed at each level in the distribution chain—its ability to compete to be included in a payer's network, the ability of end users to choose among plans that feature each hospital, and also the hospitals' ability to reach retail customers notwithstanding out-of-network status. *See Omega Environmental*, 127 F.3d at 1162–64.

A jury would not be permitted to conclude, from the evidence in the record, that St. Francis' exclusive contracts have substantially foreclosed competition in the Peoria inpatient healthcare market. St. Francis contends in the main that Methodist is not substantially foreclosed because it can compete for those same exclusive contracts every year or two when they are up for renegotiation and it can attract commercially insured patient flow through adequate alternative channels, including matching in network rates for out-of-network patients and directly marketing BCBS PPO ASO plans to area employers. Methodist argues that its opportunity to steal away exclusive contracts when they expire every year or two from St. Francis is illusory because of St. Francis' market power (a result of its "must have" status) and that the alternative channels cited by St. Francis are, in fact, not adequate as antitrust case law applies that concept in light of the market realities of health insurance.

As an initial matter, it is not at all clear that the conduct at issue in this litigation is actionable—that is, it could be construed as closer to the *Paddock Publications* kind of exclusive dealing. The complaint alleged that St. Francis locked BCBS into an exclusive network through threats to withdraw from BCBS's provider network if BCBS added Methodist to its network.

The evidence does not show any threats of that kind.  At most, it shows BCBS executives acknowledged that St. Francis' threat of withdrawal from their network may have been a negotiating tactic, but the possibility of St. Francis following through was either remote or nonexistent.  Indeed, such a move would not have been rational for St. Francis, given BCBS's dominant position in the Peoria market.

In the end, however, whether Methodist had an opportunity to compete for any individual insurer's contract goes directly to whether it was substantially foreclosed from the market.  And even if there is a dispute whether Methodist could in fact have competed for a particular exclusive contract (the wholesale level of competition), there remains an additional question whether it was foreclosed from accessing patients at intermediate and retail levels.

### 1.        The foreclosure calculations

Capps' report concludes that in 2009, St. Francis' exclusive contracts foreclosed 54 percent of the market for commercial inpatients and 52 percent of the market for 2012.  The 54 percent number includes three contracts:  the BCBS PPO (29 percent); the Caterpillar PPO (12 percent); and the Humana plan (13 percent).  The 52 percent number includes four contracts:  the BCBS PPO (34 percent); the Humana plan (10 percent); the HAMP plan (6 percent); and the small Aetna plan (1 percent).  St. Francis has challenged Capps' foreclosure calculation on several grounds.  MSJ 57–70.  As to the 2009 calculation, St. Francis contends that it overshoots the true figure because:  (1) it includes as foreclosed patients who were actually treated at Methodist on an out-of-network basis; (2) it includes as foreclosed to Methodist BCBS PPO ASO covered lives—and Methodist could compete to be in network for ASO plans if it chose to market that option to employers; (3) it includes as foreclosed those members of the Humana plan who work for OSF; and (4) Methodist did not plead a Caterpillar "claim" so it may not include

the exclusive Caterpillar contract in its foreclosure calculation.  As to the 2012 foreclosure

calculation, St. Francis makes the same arguments to the extent they remain relevant based on

the different exclusive contracts in effect at the time, and also contends that the foreclosure

figure should not include HAMP covered lives because Methodist had the same opportunity as

did St. Francis to contract with HAMP but rejected HAMP's terms (which St. Francis agreed to).

Methodist argues that any dispute about the data underlying Capps' figures is factual in

nature—that is, whether certain classes of commercial patients were actually foreclosed to

Methodist is an issue that must be decided by a jury.  Not so.  It is the Court's duty to ensure

only legally relevant testimony reaches a jury.  *See* Fed. R. Evid. 401 and 702.  If Capps' figures

includes patients who, as a matter of law, are not foreclosed from Methodist based on undisputed

facts, then the jury may not consider them foreclosed.  The principle applies equally at summary

judgment.

### A.    2009 Foreclosure

#### i.    *Patients actually treated at Methodist*

First, patients that were actually treated at Methodist were not foreclosed to Methodist,

no matter how foreclosure is defined.  Methodist does not make any reasoned challenge on the

point.  *See* Resp. 129–30, ECF No. 153-1.  Even if it were to contend that out-of-network

payments were somehow lower than in-network payments, it has not pointed to any evidence to

support that argument.  Accordingly, the foreclosure figure for 2009 cannot include patients

actually treated at Methodist.

#### ii.    *Patients covered by BCBS PPO ASO plans*

Next, patients covered by a BCBS PPO ASO plan were not foreclosed to Methodist.  The

contract between St. Francis and BCBS permits employers to include Methodist in their provider

network if they use an ASO plan.  It is true that BCBS was directed by St. Francis not to market that option to customers.  But there was nothing standing in Methodist's path to convince employers to add it to their provider networks.  If an employer so elected, the evidence suggests BCBS would have accommodated the request.  Although the contract required BCBS to "notify" St. Francis if an employer added Methodist to its network, there is no evidence that St. Francis could or would have vetoed the request.

At least three area employers took advantage of the ASO network flexibility and added Methodist as an in-network provider, and Methodist tried to sell the option to another of the area's largest employers.  That employer, Peoria's public school system, did not choose to add Methodist, but it was not because it did not have the opportunity to do so.  Perhaps it would rather have maintained the lower prices to which a narrower network entitled it—the reason does not matter, what matters is that St. Francis did not prevent the employer from implementing a broad network for its self-insured employee benefit plan.

Methodist's major argument in opposition, that all BCBS PPO ASO insureds are foreclosed from Methodist, is that because BCBS would not actively market the option of adding Methodist to the network, then Methodist could not "truly compete" for those patients' business because of transaction costs associated with individual bargaining.  Resp. 130–33.  Methodist's point is well-taken at a certain level, but is belied by the record.  The evidence shows that several employers did, in fact, open their ASO plan's provider network to include Methodist.  It also shows that narrower networks enjoy lower prices, so even if an employer has the option to make its network broad it may not wish to do so based on price.  Moreover, the evidence suggests that Methodist failed to pursue the option of marketing itself to self-insured employers.  Methodist's failure to vigorously go after potential business is not St. Francis' fault.

Methodist was able to compete to be in the provider network for BCBS PPO ASO plans. The antitrust laws do not require more. Accordingly, those patients are not foreclosed from Methodist, and may not be included in the foreclosure calculation.

### iii.  OSF employees covered by Humana

OSF employees are not unlawfully foreclosed from Methodist. St. Francis is correct that OSF has no legal duty to compete with itself—that is, the federal antitrust laws do not assign liability for excluding Methodist from the provider network used by its employees. *See Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals . . . .").

When OSF sold its health plan to Humana, it required Humana to maintain St. Francis exclusivity (in return for favorable pricing). A large portion of the covered lives under the Humana plan have remained OSF employees. Methodist contends that OSF employees should be excluded entirely from the market and any foreclosure calculation. That is not correct; this case is about unlawful foreclosure. The relevant product market is commercially insured inpatient services, therefore the foreclosure calculation is based on the total Peoria area commercially insured patients. The numerator—what matters in this case—is the number of unlawfully foreclosed patients.[14] That some of the market is lawfully foreclosed does not diminish the overall scope of the product market.

Accordingly, the OSF employees covered by the exclusive Humana plan must be excluded from the foreclosure calculation.

### iv.  Caterpillar employees

---

[14] If the Court did not count OSF employees in the overall product market, it would also have to eliminate Methodist employees because Methodist also is the exclusive provider for its employees' health plan. Both OSF and Methodist are major Peoria employers, and although OSF is larger, the difference is not material in this case.

Finally, although the Caterpillar PPO was a St. Francis exclusive in 2009, Caterpillar's contracting history shows that, as a matter of law, those patients were not unlawfully foreclosed from Methodist. The way in which Caterpillar has bargained for its employees' health insurance shows the market is competitive, and competitive markets are protected by the antitrust laws.

Caterpillar for several years offered its employees two products, the far more popular one was a PPO exclusive to St. Francis. Motivated by dissatisfaction with St. Francis' pricing and quality, Caterpillar revamped its plans' networks effective in 2010. Its goal was unambiguously to offer its employees a choice between the hospitals in an effort to promote competition between St. Francis and Methodist. As a result of the new plans' structure, detailed above, prices for the services only St. Francis could provide went up dramatically, and the prices for services which Methodist could also provide went up a little bit.

This shows that Methodist was able to compete for Caterpillar business. Caterpillar is a much different animal than BCBS in this case. It does not need to package a product to sell at retail—it only worries about what is best for its employees. Where the evidence may show that BCBS "must have" St. Francis in network to sell the products it thinks makes it competitive (although the evidence shows that several other insurance companies do not think that is the case), Caterpillar does not operate under the same constraint. At all times relevant to this case, if it wanted a St. Francis exclusive contract it was because that represented the best combination of price and network breadth from Caterpillar's perspective. When it wanted to move to a broader network, it did so, and paid for it. Accordingly, Methodist was never unlawfully foreclosed by St. Francis from competing for Caterpillar's business.

All told, the undisputed evidence shows that Methodist was only foreclosed from at most the BCBS PPO patients that were members in non-ASO plans. As described above, it had ways

to compete for BCBS ASO business, and the Caterpillar business represented the kind of competition-for-the-contract that the Seventh Circuit has held lawful in the past. Accordingly, the total foreclosure figure for 2009 is less than 20 percent of the market.[15]

### B.  2012 Foreclosure

The 2012 foreclosure calculation does not include Caterpillar, its network had by then been opened up. The major difference in the analysis is whether or not to include patients covered by HAMP. St. Francis argues that Methodist had a chance to get the HAMP exclusive contract but balked at HAMP's terms. That St. Francis subsequently made a deal with HAMP on materially similar terms that HAMP sought from Methodist but Methodist rejected cannot be considered unlawful foreclosure, according to St. Francis. Methodist argues that the HAMP exclusive came part and parcel with the Carle Clinic acquisition, detailed above, so HAMP covered lives are foreclosed from Methodist.

The evidence behind the true reason for HAMP's switch from a Methodist exclusive to a St. Francis exclusive is disputed. It may be because Methodist did not meet the terms HAMP sought or it may be because of St. Francis' pressure. For 2012, therefore, the foreclosure figure is slightly higher than for 2009, it was at most approximately 22 percent.[16]

### C.  Additional factors impacting foreclosure

In addition to the raw numbers discussed in the preceding section, two other factors identified as relevant by the case law impact the foreclosure analysis. First, none of the contracts in this litigation were for very long durations; most lasted one or two years. While Methodist points to evidence that suggests that employers are loath to switch plans from year to year, that

---

[15] The figure is probably close to 15 percent, which represents Capps' estimate minus patients treated at Methodist minus BCBS PPO ASO patients minus Caterpillar patients minus OSF employees.

[16] This represents Capps' estimate minus the patients Methodist actually treated minus BCBS PPO ASO patients minus OSF employees.

evidence does not suggest that Methodist was foreclosed from competing on a yearly basis each time the contract came up for renewal.  Even if it is disputed whether Methodist ever had a real shot at the BCBS PPO product, there are several equally likely explanations for that result—chief among them that St. Francis may simply be a more desirable hospital among Peoria residents, especially those with children.

Finally, and although it overlaps with the analysis above, Methodist had at its disposal several alternative means by which it could reach commercial patients.  First is the match program.  Methodist contends that the match program was not competition, it was instead only mitigation.  That is wordplay.  The program resulted in significant revenues.  Second, Methodist had its own exclusive BCBS product, which BCBS executives pointed out was not well-received by the commercial marketplace because, in part, it was too expensive to compete with the BCBS PPO product.  This, of course, was in addition to the other plans for which Methodist was an in-network provider.  The evidence shows that many employers could have chosen a Methodist exclusive plan but opted not to.  Taken together, these two factors only operate to decrease the total foreclosure number.

Neither of Capps' foreclosure calculations, especially when combined with the other factors detailed above, could support a jury's conclusion that Methodist was substantially foreclosed from the inpatient market as a matter of law.  Accordingly, the Sherman Act claims must fail.

As a final note, it is worth distinguishing the *Dentsply* case on which Methodist so heavily relies.  That case dealt with the nationwide market for false teeth, in which manufacturers sold teeth to dealers that sold teeth to laboratories that sold teeth to dentists.  *See* 399 F.3d at 184–85.  A manufacturing firm called Dentsply that sold 75 to 80 percent of artificial

26

teeth in the United States prevented, pursuant to written corporate policy, the dealers it distributed through from selling any of its competitors' teeth, with one narrow exception.  *Id.* at 185.  The district court determined after a trial that Dentsply's corporate policy did not violate § 2 because other manufacturers had alternative channels of distribution—they could sell directly to labs.  The Third Circuit reversed.  It held that the alternative channels were not in fact adequate because the dealers played a crucial role in sales and service to labs and dentists.  *Id.* at 191–93.  Further, the corporate policy at issue was a "solid pillar of harm to competition" because it had a "significant effect" at preserving Dentsply's monopoly.  *See id.*  The next largest competitor in the market had about 5 percent market share, *id.* at 184, and "dealers ha[d] a controlling degree of access the laboratories," *id.* at 193.

Dentsply held far more sway over the relevant market than does St. Francis, and its exclusive dealing *completely* foreclosed the distributors to its competitors, other than those competitors who may have been grandfathered in.  As shown above, that's just not the case here—Methodist has not been significantly foreclosed from competing for commercially insured inpatient business because, at a minimum (1) Methodist can compete for insurers' contracts at the wholesale level; (2) employers and often employees can select a Methodist-based plan over a St. Francis-based plan; and (3) any patient covered by Methodist's match program, and the record suggests that program applies to at least the BCBS PPO, may choose to be treated at Methodist at no additional cost even when they are out of network.  Next, Dentsply's exclusionary policy only worked to hurt rivals—that is, there was no legitimate business reason for the policy.  Here St. Francis benefits from its exclusives by way of more predictable patient volume and insurance companies freely choose exclusivity to avoid paying an open-network premium.  St. Francis' prices may be high, but it is a partial monopolist and is permitted to

27

charge monopoly prices for those services it has a monopoly over.  Finally, the Peoria market is

small and concentrated.  Methodist knows exactly which major employers it could target to

increase its ASO business, unlike *Dentsply* which had a large and geographically dispersed

market that would be nearly impossible for a small manufacturer to reach without the help of a

distributor's network.  In sum, while this case bears some superficial resemblance to *Dentsply*,

the evidence does not show Methodist is substantially foreclosed from competing for

commercially insured patients, and therefore there can be no federal antitrust liability.

   **c.**  **The outpatient surgical services market**

   The second part of this case involves alleged foreclosure of the outpatient medical

services market.  The crux of the claim is the same:  St. Francis' exclusive contracts that bar

payers from including Methodist in their provider networks substantially forecloses Methodist

from competing for outpatient surgical business.

   Outpatient surgical services are performed at ambulatory surgical centers or at hospitals

or at doctors' offices and do not require an overnight stay in a hospital.  In one paragraph of

Capps' report, he states that "[a] wide variety of procedures can now be performed on an

outpatient basis including colonoscopies, endoscopies, arthroscopies, various eye procedures,

musculoskeletal procedures, and other procedures such as carpal tunnel surgery."  Capps Report

¶ 66.  He then tightens his definition of outpatient surgery significantly to include only "invasive

surgical procedures that are generally performed in an operating room and often require

anesthesia."  *Id.* ¶ 69.  Capps' second definition excludes any diagnostic testing that does not

involve an incision (for example, imaging, endoscopy, or other services typically marketed on

ambulatory surgical centers' websites).  By way of background, St. Francis' exclusive contracts

generally bar payers from including Methodist hospital in their provider networks.[17]  As a consequence, patients covered by, for example, the BCBS PPO would not be in network if they received outpatient surgery at Methodist.

St. Francis makes two arguments in support of summary judgment on the outpatient surgery claims:  (1) Capps did not perform a foreclosure analysis for the outpatient surgery market, instead assuming the figures matched those for inpatient services, and (2) the relevant exclusive contracts simply do not restrict network construction as it relates to outpatient surgery. Methodist falls back on its inpatient foreclosure calculation and argues that "[t]he question is not the market share of the providers in the outpatient surgery market . . . but the size of the various payers, particularly the foreclosed payers."  Resp. 138.

The Court agrees with St. Francis for two reasons.  First, there is no evidence of the level of foreclosure in the outpatient surgical services market.  To contend as Methodist does that the level of foreclosure for outpatient surgery as for inpatient surgery is the same is simply too speculative, especially in a case replete with documentary evidence from which it could have performed calculation of the relevant services.  Second, Methodist relies entirely on the foreclosure levels that the Court has already found insufficient to support a Sherman Act claim as a matter of law.  Accordingly, the motion for summary judgment is granted on any claims arising out of the market for outpatient surgical services.[18]

### d.      Remaining state law claims

---

[17] The exclusivity provision for Humana is slightly different, but not materially so.

[18] The Court need not address Capps' cramped and internally inconsistent definition of outpatient surgical services, which excludes, for example, any endoscopy or colonoscopy or any non-invasive diagnostic imaging.  Methodist owns 49 percent of the Central Illinois Endoscopy Center, and Capps' narrower definition of outpatient surgery therefore excludes the CIEC from foreclosure calculation.  In other words, had Capps stuck to his original definition of outpatient surgery, the evidence would show far less foreclosure because the BCBS PPO contract did not prevent BCBS from including the CIEC in any of its provider network.

The complaint asserts eight state law claims.  They include three antitrust claims arising under Illinois law (exclusive dealing, monopolization, and attempted monopolization), four tortious interference claims (one for each St. Francis exclusive contract), and an Illinois Consumer Fraud Act ("ICFA") claim.

St. Francis contends the Illinois antitrust claims must fail because Illinois antitrust law tracks federal antitrust law; the ICFA claim must fail because it is premised on alleged antitrust violations; and the tortious interference claims fail due to the defense of competitor privilege. Methodist concedes that if the federal antitrust claims fail the Illinois antitrust claims fail.  It then contends that all that is needed to support an ICFA claim is an "oppressive" practice and it has proved that St. Francis has oppressed Methodist through its use of exclusive contracts.  Finally, it argues that its tortious interference claim cannot be defeated by competitor's privilege under Illinois law.

As to the Illinois antitrust claims, they fail because the Sherman Act claims do.  *See* 740 ILCS 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.").  Methodist does not argue differently.

As to the tortious interference claims, Illinois courts have created a competitor's privilege to liability that St. Francis is entitled to rely upon.  *See Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008) ("Under Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will.").  "[I]mproper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement," however, are not privileged.  *Id.*  "Section 767 of the Restatement

(Second) of Torts defines the factors to be considered in determining whether interference is improper," thus vitiating the privilege.  *Miller v. Lockport Realty Grp., Inc.*, 878 N.E.2d 171, 178 (Ill. App. Ct. 2007).  One of those factors, "the relations between the parties," is further broken down into four sub-factors, which if satisfied conjunctively preclude a finding of impropriety. *Id.*  Those four sub-factors are that:

> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

*Id.* (citing Restatement (Second) of Torts § 768(1)); *see also A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992).  The first and fourth elements are met in this case.  The third is as well based on the Court's analysis of the antitrust claims above and the ICFA claim below.  The final sub-factor, the non-employment of wrongful means, is further defined by the Restatement to include things like physical violence, fraud, or civil lawsuits.  *See* Restatement (Second) of Torts § 768 comment (e).  The Restatement's commentary specifically permits "limited economic pressure" and also for the competitor to refuse to do business with third parties.  *Id.*

Given that the Court has found no legal basis for any antitrust violations, and the record does not show any wrongful means as Illinois courts use that term, the tortious interference claims must fail due to St. Francis' invocation of the competitor's privilege.  To the extent Methodist contends that St. Francis used threats and coercion to secure its exclusive contracts, the Court has already noted that the evidence does not show any such threats actually occurred, and if they did they would have been so remote that no executive could have afforded them credence.

Finally, as to the ICFA claim, Methodist contends that summary judgment is improper because is has shown that St. Francis' tactics are oppressive. The text of the ICFA primarily addresses deceptive business conduct, *see* 815 ILCS 502/2, but Illinois courts have also held the statute proscribes "unfair" conduct, *see Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). In order to prevail on an ICFA claim based on unfair conduct, a plaintiff must prove "(1) [that] the practice offends public policy; (2) [that] it is oppressive; and (3) [that] it causes consumers substantial injury." *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996). "'All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'" *Robinson*, 775 N.E.2d at 961 (quoting *Cheshire Mortgage Serv., Inc. v. Montes*, 612 A.2d 1130, 1143 (Conn. 1992)). Methodist does not explain what "public policy" means, or attempt to apply that definition to the facts of this case. *See* Resp. 149–50. It states only that St. Francis' practices were oppressive (but does not define oppression or explain how or why St. Francis has acted the oppressor) and concludes that St. Francis injured consumers by charging high prices. Methodist has not produced evidence from which a jury could conclude the ICFA has been violated. *See Saunders*, 662 N.E.2d at 608 ("[C]harging an unconscionably high price generally is insufficient to establish a claim for unfairness under the Consumer Fraud Act. . . . Rather, the defendant's conduct must . . . be so oppressive as to leave the consumer with little alternative but to submit . . . ."). Especially so since the Court has found that St. Francis' conduct was not unlawful under the federal antitrust laws and the record does not show the threats and coercion alleged in the complaint.

Summary judgment is granted on the state law claims.

## II.     Parties' Motions to File Under Seal

Both Methodist and OSF have moved to file a number of documents accompanying their briefing under seal, ECF Nos. 151, 164, 165, 174. These motions are GRANTED in part and DENIED insofar as they request sealing and redaction of documents cited by the Court in this Order.

### 1.   Legal Standard

As a general rule, "the record of a judicial proceeding is public." *Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir. 2002).  Concealing records reduces the public's ability to monitor judicial performance. *Id.* at 928.  Moreover, judicial proceedings are public, and parties "must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials" when they call upon the courts. *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).  Exceptions to this rule are limited: "[w]hen there is a compelling interest in secrecy, as in the case of trade secrets, the identity of informers, and the privacy of children, portions and in extreme cases the entirety of a trial record can be sealed."  *Jessup*, 277 F.3d at 928; *see also Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) ("[V]ery few categories of documents are kept confidential once their bearing on the merits of a suit has been revealed.").

The parties to this litigation have rightly noted that the antitrust context presents its own particular challenges for courts weighing the public release of information. Pl.'s Am. Mot. Leave to File Under Seal 5, ECF No. 164; Def.'s Am. Mot. Leave to File Under Seal 5, ECF No. 174.  Discovery in antitrust litigation, by its broad nature, requires the production of sensitive information regarding business strategy, financials, and operations. *See e.g. AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 577 (7th Cir. 1999).  Further, the purpose of antitrust law is to

foster market competition, and the exchange of pricing information during litigation could be used by other parties as "the basis of effective collusion" in future negotiations. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1346 (7th Cir. 1986). Specific to the healthcare industry, the Seventh Circuit has acknowledged that the release of provider-payer rate negotiations could result in an unfair advantage to providers. *Id.* at 1345. Illinois law recognizes that certain information shared between providers and payers during contracting constitutes confidential trade secrets. 215 ILCS 5/368b(b) (fee schedules, capitation schedules, and the network provider administration manual are trade secrets).

> Secrecy is fine at the discovery stage, before the material enters the judicial record. But those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.

*Baxter Int'l*, 297 F.3d at 545 (internal citation omitted); *see also United States v. Foster*, 564 F.3d 852, 853 (7th Cir. 2009) ("Information that affects the disposition of litigation belongs in the public record unless a statute or privilege justifies nondisclosure.").

### 2. Analysis

Following the approach laid out by the Seventh Circuit in *Baxter*, and after a thorough review of the sealed record,[19] the Court accepts the parties' designations of confidential information, except in regard to those documents that underpin the Court's ruling on the summary judgment motion. *See Baxter Int'l*, 297 F.3d at 545–46. To determine whether their contents meet the sealing standard, the Court has paid special attention to documents cited in this Order, including: the Defendant's Memorandum in Support of its Motion for Summary

---

[19] The parties have submitted detailed briefing regarding the documents they have requested to remain under seal, complete with affidavits from non-party counsel providing analysis of each document requested to be sealed. *See e.g.* Pl.'s Am. Mot. For Leave to File Under Seal, Exs. AS, BK, BL, BN, ECF Nos. 164-47,65, 66, 68. The parties have complied with the expectations set out in *Baxter* that parties who move to seal documents should "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Baxter Int'l*, 297 F.3d at 548.

Judgment, ECF No. 151-1, the Plaintiff's Response to OSF's Motion for Summary Judgment, ECF No. 164-1, the Expert Report of Dr. Cory S. Capps, ECF No. 162-4, Ex. 233, and Duggan 3/5/2010 Email, Resp. Ex. 156, ECF No. 159-11.

Regarding the Memorandum in Support of the Motion for Summary Judgment and the Plaintiffs' Response, the parties filed both unredacted, sealed versions, ECF Nos. 144-1, 153-1, for the Court, and redacted, unsealed public versions, ECF Nos. 151-1, 164-1, to accompany their motions to seal. Most of the redacted information in these two documents may remain redacted, either because it was not relied upon in the Court's Order, or because the Court has determined that good cause exists for the information to remain redacted. However, the Court relied on a portion of the redacted briefing that does not meet the sealing standard. For example, some information unsealed by the Court included general definitions of market foreclosure, statements about the calculation of market foreclosure, and general descriptions of healthcare industry contracting trends. *See e.g.,* Court's Partially Unsealed Def.'s Mem. Supp. Mot. Summ. J. 65 (testimony discussing "standard practice[s]" amongst hospitals); *Id.* at 58 (describing generally Capps' approach to foreclosure calculation).

The Court will file a third version of these documents in which it has unsealed the information it has determined does not meet the standard.[20] The Court has not unsealed information—particularly regarding contract negotiations, specific contractual terms, and pricing information—that it determined to meet the above standard for remaining under seal.

Plaintiffs moved to file under seal the entirety of the expert report of Dr. Cory Capps. Pl.'s Am. Mot. For Leave to File Under Seal 8. Though the report undoubtedly contains sensitive information, the entirety of its 234 pages do not. The Court has provided a redacted

---

[20] These documents are attached as Exhibits to this Order and will be identified as Court's Partially Unsealed Def.'s Mem. Supp. Mot. Summ. J., Ex. 1, and Court's Partially Unsealed Pl.'s Resp., Ex. 2.

version of the Report,[21] unsealing only the portions cited in its Order: the unsealed portions of the Report include information such as the types and volumes of services provided at each hospital, which are not highly sensitive or confidential.  *See e.g.*, Court's Partially Unsealed Capps Report ¶¶ 105-08; 234.

The Court finds that Resp. Ex.156, a document produced by Caterpillar containing a detailed discussion of pricing terms and negotiation strategy for its agreement with OSF, should remain under seal.

The parties' motions for leave to file under seal, ECF Nos. 151, 164, 165, 174, are granted in full, except as detailed above.

CONCLUSION

The Clerk is directed to unseal Defendant's Motion for Summary Judgment and change the caption of ECF No. 144 to reflect that it is the Motion for Summary Judgment by OSF Healthcare System d/b/a Saint Francis Medical Center. All other exhibits filed with the Motion are to remain under seal.  Defendant's Motion for Summary Judgment, ECF No. 144, is GRANTED.  Plaintiff's Motion to Address Misrepresentations and to Correct the Record, ECF No. 172, is GRANTED. The parties' motions for leave to file under seal, ECF Nos. 151, 164, 165, 174, are GRANTED in full, except as detailed in this Order.  The Clerk is directed to enter judgment and close the case.

Entered September 30, 2016.

s/ Sara Darrow
_____
SARA DARROW
UNITED STATES DISTRICT JUDGE

---

[21] The document shall be identified as Court's Partially Unsealed Capps Report, Ex. 3.